**CANAL NATIONAL BANK**

v.

**OLD FOLKS' HOME ASSOCIATION OF BRUNSWICK et al.**

**The MERRILL TRUST COMPANY, Trustee under the Will of Margaret S. Kennedy**

v.

**The INHABITANTS OF the TOWN OF BUCKSPORT, and Joseph E. Brennan, as Attorney General.**

**MAINE NATIONAL BANK, Trustee under the Will of Ruth P. W. Tarbox**

v.

**GRACE EPISCOPAL CHURCH et al.**

**In re DAVENPORT TRUST FUND.**

Supreme Judicial Court of Maine.

Nov. 10, 1975.

---

Pierce, Atwood, Scribner, Allen & McKusick by William C. Smith, Jotham D. Pierce, Portland, for plaintiffs.

Verrill, Dana, Philbrick, Putnam & Williamson by Peter B. Webster, Portland, Richard L. Barton, Brunswick, Jerome S. Matus, Asst. Atty. Gen., Bureau of Taxation, Augusta, Fellows, Kee & Nesbitt by Frank G. Fellows, Bucksport, Fitzgerald, Donovan & Conley, P.A. by Duane D. Fitzgerald, Donald A. Spear, Bath, for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WERNICK, Justice.

Before us are four cases raising similar issues resolution of which may be adequately achieved by discussion in a single opinion.

The cases are on Report upon stipulated facts (Rule 72(a) and (b) M.R.C.P.).[1] Our decision is sought upon important and difficult questions of law precipitated as to four charitable trusts by provisions of the Federal Tax Reform Act of 1969 (hereinafter the "Tax Reform Act"),[2] which undertook to eliminate abuses of the tax laws arising by or through the use of "private foundations", and by 18 M.R.S.A. § 3956 (hereinafter "Section 3956") enacted by the Legislature of Maine as a State response to implement particular facets of the Tax Reform Act.

Problems confront the trustees of the respective trusts because (1) the trusts are devoted to the kinds of charitable uses or organizations described in Section 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. and hereinafter designated the "Code"), and (2), therefore, by virtue of Section 4947(a)(1) of the Code, the trusts are treated, for the purposes of the applicability of various rules prescribed to govern "private foundations", as charitable organizations within the scope of Section 501(c)(3).[3]

*I—The Litigation History*

*I–A "The Turner Case" (Cumberland County)*

The Canal National Bank is a successor trustee under an irrevocable inter-vivos trust between Solon E. Turner (now deceased) and Samuel L. Forsaith dated March 20, 1931 (hereinafter the "Turner Trust"). The Trust is for the benefit of The Old Folks' Home Association of Brunswick and provides in pertinent part:

> "Third. Said Trustee shall pay the net *income* of said trust fund, as received by him, in quarterly payments to The Old Folks' Home Association of Brunswick, a charitable corporation located at said Brunswick, for the purposes thereof, forever." (emphasis supplied)

---

1. The Report is by Judges and Justices presiding in the respective Courts in which the actions were instituted, as hereinafter more fully appears.

2. P.L. 91–172, 83 Stat. 487, et seq.

3. To be a charitable organization *within* Section 501(c)(3), thereby to be exempt from federal income taxes, a trust is required to apply for, and receive, a determination of such status. Here, one of the Trusts (Davenport), but none of the others, has received a determination that it is a charitable organization under Section 501(c)(3). This distinction is immaterial for present purposes, however, since, even without a determination that they are charitable organizations as described by Section 501(c)(3), the charitable trusts here involved are, by virtue of Section 4947(a)(1) of the Code, subject to the various "private foundation" rules and to the sanctions imposed for failure to comply with them.

On December 31, 1971 the successor trustee commenced a civil action in the Superior Court (Cumberland County) against The Old Folks' Home Association of Brunswick as income beneficiary and the Attorney General in his capacity as supervisor of proper enforcement of charitable trusts under 5 M.R.S.A. § 194.[4] The complaint sought construction of the Turner Trust in light of the Tax Reform Act and Section 3956 and reformation of the trust, if necessary. On February 13, 1973 the presiding Justice ordered that Peter B. Webster, Administrator d.b.n.c.t.a. of Solon E. Turner, be joined as a party defendant.

### I–B "The Kennedy Case" (Penobscot County)

The Merrill Trust Company is the trustee of a testamentary trust for the benefit of deserving and needy students of Bucksport, Maine established under Article Eleventh of the will of Margaret S. Kennedy, now deceased (hereinafter the "Kennedy Trust"). As here relevant, Article Eleventh provides:

> "The net annual *income* from this trust is to be used by the Trustee as it shall from time to time deem it wise to assist in providing a college education or vocational training for one or more deserving and needy students from the Town of Bucksport." (emphasis supplied)

On December 30, 1971 The Merrill Trust Company, as trustee, initiated action in the Probate Court (Penobscot County) against the Inhabitants of the Town of Bucksport as holders of a beneficial interest in the Kennedy Trust (because Bucksport students receive financial assistance from the Trust to further their education) and against the Attorney General in his capacity as supervisor of charitable trusts. The complaint sought construction of the Kennedy will in light of the Tax Reform Act

and Section 3956 and reformation, if necessary.

By order of the Probate Court the known heirs of the testatrix were joined as parties defendant. All failed to appear in the action with the exception of Frederick T. Hawes who appeared by attorney. Thereafter, however, he failed to file an answer or otherwise participate in the proceedings. Prior to entry of his order reporting the case to the Law Court the Probate Court Judge had entered judgment of default against all of the heirs named as parties.

■ As we explained in *Lindsey v. County of Cumberland*, Me., 278 A.2d 391 (1971) the language in Rule 72(a) M.R.C. P. " . . . where all parties appearing so agree . . . " and the phrase in Rule 72(b) " . . . upon request of all parties appearing . . . " plainly authorize a report to the Law Court without need for agreement by any named parties who have been adjudicated defaulted for failure to appear.

This Court has not previously decided, however, concerning the impact of Rule 72(a) and (b) relative to the situation in which, as here, a named party has appeared but has been defaulted for failure thereafter to participate. Must such a party agree to a report ordered after the adjudication of default as a precondition of the Law Court's jurisdiction under Rule 72(a) or (b)?

We interpret the language "parties appearing" to signify that it is not necessary to have the agreement of a party who has appeared but has been adjudged in default prior to an order of report pursuant to Rule 72(a) or (b). This view is strongly indicated by the participle "appearing", in contradistinction to the phrase "have appeared", since it clearly suggests a continuingly active participation in the proceeding.

---

4. 5 M.R.S.A. § 194 provides:
   "The Attorney General shall enforce due application of funds given or appropriated to public charities within the State and prevent breaches of trust in the administration thereof."

This conclusion is also supported by the nature of the change in the prior law which it is the calculated purpose of Rule 72(a) and (b) to achieve. In *Lindsey v. County of Cumberland*, supra, we explained that, as shown by the Reporter's Note to Rule 72:

> "The language 'all parties appearing' . . . changes the result of *Fenn v. Fenn*, 130 Me. 520, 155 A. 803 (1931), which held a report improper where certain of the defendants defaulted and did not join in the agreement." (p. 392)

Although *Fenn v. Fenn* dealt with the case in which a bill in equity had been taken pro confesso against named defendants who had failed to appear, the decision rested on a rationale which rendered immaterial any distinction as to entry of a decree pro confesso for failure to appear and failing to participate after appearing. The reasoning of *Fenn v. Fenn* was that

> "[d]efendants in default in an equity action under a decree *pro confesso* are still parties and have some rights." (130 Me. p. 521, 155 A. p. 804.)

On this basis the Court added:

> "Unless all parties agree to a report of the cause in which they are joined, . . . it is the duty of the sitting Justice to hear the evidence and make such rules, orders or decrees thereon as the law of the case requires." (p. 521, 155 A. p. 804)

—thereby to guarantee that

> " . . . any party aggrieved [including those against whom the bill has been taken pro confesso and who are still parties with some rights] has the right of exception and appeal reserved to him and the rights of all other parties are left unimpaired." (p. 521, 155 A. p. 804)

Since it was the consequences produced by this underlying rationale which it was the avowed purpose of Rule 72(a) and (b) to change, and since, further, the same ra-tionale has application not only to parties who fail to appear but also to those defaulted for failure to participate after appearing, we conclude that the agreement by such defaulted parties is not necessary to the "report" jurisdiction of the Law Court under Rule 72(a) or (b).

Notwithstanding, therefore, that the defendant Frederick T. Hawes failed to agree to the order of the report and to the stipulation of facts accompanying the Report, this Court has jurisdiction of the "Kennedy case" under Rule 72(a) or (b) since, prior to the entry of the order of report, said Hawes had been adjudicated in default for failure of participation in the proceeding.

*I–C "The Tarbox Case" (Sagadahoc County)*

Maine National Bank is trustee for the benefit of Grace Episcopal Church, Old Folks' Home and Old Ladies Home under a Trust established by Article Thirteenth of the will of Ruth P. W. Tarbox, now deceased (hereinafter the "Tarbox Trust"). Article Thirteenth, as pertinent, states:

> "(a) My said Trustee shall pay, in memory of my deceased son, Alfred L. Tarbox, Jr., to Grace Episcopal Church, of Bath, Maine, from the *income* of said Trust Fund the sum of fifty dollars ($50) quarterly, the same to be used for such of the general purposes of said Church as its governing board may from time to time determine.
>
> "(b) My said Trustee shall pay at least quarterly all the balance, if any, of the *income* of said Trust Fund in equal shares to the Old Folks' Home and to the Old Ladies Home, both located in said Bath, to be used for such of the general purposes of said institutions as their respective governing boards may from time to time determine." (emphasis supplied)

On January 4, 1972 the trustee initiated an action in the Probate Court (Sagadahoc

County) against Grace Episcopal Church, Old Folks Home and Old Ladies Home, as income beneficiaries, and against the Attorney General in his capacity as supervisor of charitable trusts, seeking construction of the Tarbox will in light of the Tax Reform Act and Section 3956 and reformation, if necessary.

█ Subsequently, plaintiff trustee moved that James C. Rogers, a cousin of the testatrix asserted to be her "sole heir at law and only next of kin", be joined as an additional party defendant. The motion was granted and James C. Rogers was duly served with process. He appeared by attorney and filed an answer to the complaint. Thereafter, the attorney for defendant James C. Rogers withdrew as his attorney but James C. Rogers remained a party defendant in the case who had an answer on file. Neither defendant Rogers nor any attorney purporting to represent him has agreed to the report of the case or to the stipulation of facts accompanying the report. Defendant Rogers was never adjudicated defaulted.

There is thus a failure of compliance with the requirement of Rule 72(a) or (b) that "all parties appearing" agree to an order of report and to any "agreement as to all material facts" if the report is upon an agreed statement of facts.

Because of this failure we lack jurisdiction, as purportedly predicated either under Rule 72(a) or Rule 72(b), of the "Tarbox Case". Moreover, jurisdiction of the Law Court cannot here derive from Rule 72(c) since the Probate Court had made no "interlocutory order or ruling" upon the questions of law reported.

Accordingly, the report in the "Tarbox Case" must be discharged.

*I–D "The Davenport Case" (Sagadahoc County)*

Donald N. Small, William L. Skelton and John W. Coombs were named and con-firmed as trustees of a testamentary trust established to promote various charitable purposes under Article 6 of the will of George P. Davenport, deceased (hereinafter the "Davenport Trust"). Article 6 provides, inter alia:

"I desire that the above Fund shall be well and safely invested, the *interest only* to be used at their discretion by the Trustees hereinafter named for the above named purposes." (emphasis supplied)

On December 29, 1971 the trustees commenced a proceeding in the Superior Court, Sagadahoc County, seeking construction of the Davenport will and permission to deviate from its terms, if necessary. Acting pursuant to his duties as supervisor of charitable trusts under 5 M.R.S.A. § 194, the Attorney General appeared and answered, raising the issues hereinafter addressed.

*II—The Framework of the Issues as Fixed by the Statutory Structure*

The Tax Reform Act introduced the concept of a "private foundation" and required that any private foundation adhere to a complex system of rules violation of which results in severe penalties. As here relevant, the "private foundation" rules are basically of two kinds: (1) rules designed to correct abuses such as self-dealing, holding securities of a single company, investing so as to jeopardize the trust's charitable purpose, and making impermissible expenditures; and (2) rules to assure adequate distribution of trust monies to the charitable beneficiaries.

In light of these "private foundation" rules the general problem we confront is as follows. Although the Tax Reform Act provides that compliance with the "private foundation" rules can be achieved only when the governing instrument of a trust contains the substance of the rules among its provisions, regulations having the effect

of law have been issued[5] establishing that the governing instrument of a charitable trust subject to "private foundation" rules shall be deemed amended to include said rules whenever a State statute directs such trusts to comply with them. It was in response to these regulations that the Legislature enacted Section 3956.[6]

Zeroing in on Section 3956, however, we find that although its subsection 1 prohibits trustees from engaging in any of the abuses prohibited by the first category of "private foundation" rules and subsection 2 requires the distribution of amounts sufficient to meet the requirements of the second class of rules, subsection 3 dictates that the prohibitions of subsection 1 and the mandates of subsection 2 shall be without application to any trust if

". . . such application would be contrary to the terms of the instrument governing such trust and . . . the same may not properly be changed [by a Court of competent jurisdiction] to conform to such subsections."

Thus, the issue reported for our decision is more specifically crystallized into the inquiry whether compliance with the two categories of "private foundation" rules may be "contrary to . . . terms" of the governing instruments of the trusts properly before us, and if there is such contravention, whether the "terms" may "properly be changed" to permit conformity to subsection 1 and subsection 2 of Section 3956— thereby to allow the substance of those subsections to be deemed incorporated in the governing instrument.

---

5. 26 C.F.R. 1.508–3(d), CCH *Standard Federal Tax Reporter*, Par. 3114.

6. 18 M.R.S.A. § 3956 provides:
   "§ *3956. Prohibitions and requirements applicable to trusts which are private foundations*
   "*1. Prohibitions.* In the administration of any trust which is a 'private foundation,' as defined in section 509 of the Internal Revenue Code of 1954, a 'charitable trust,' as defined in section 4947(a)(1) of the Internal Revenue Code of 1954, or a 'split-interest trust' as defined in section 4947(a)(2) of the Internal Revenue Code of 1954, the following acts shall be prohibited:
   "*A.* Engaging in any act of 'self-dealing,' as defined in section 4941(d) of the Internal Revenue Code of 1954, which would give rise to any liability for the tax imposed by section 4941(a) of the Internal Revenue Code of 1954;
   "*B.* Retaining any "excess business holdings,' as defined in section 4943(c) of the Internal Revenue Code of 1954, which would give rise to any liability for the tax imposed by section 4943(a) of the Internal Revenue Code of 1954;
   "*C.* Making any investments which would jeopardize the carrying out of any of the exempt purposes of the trust, within the meaning of section 4944 of the Internal Revenue Code of 1954, so as to give rise to any liability for the tax imposed by section 4944(a) of the Internal Revenue Code of 1954; and
   "*D.* Making any 'taxable expenditures,' as defined in section 4945(d) of the Internal

Revenue Code of 1954, which would give rise to any liability for the tax imposed by section 4945(a) of the Internal Revenue Code of 1954; provided that this section shall not apply either to those split-interest trusts or to amounts thereof which are not subject to the prohibitions applicable to private foundations by reason of the provisions of section 4947 of the Internal Revenue Code of 1954.
   "*2. Requirements.* In the administration of any trust which is a 'private foundation' as defined in section 509 of the Internal Revenue Code of 1954, or which is a 'charitable trust' as defined in section 4947(a)(1) of the Internal Revenue Code of 1954, there shall be distributed, for the purposes specified in the trust instrument, for each taxable year, amounts at least sufficient to avoid liability for the tax imposed by section 4942(a) of the Internal Revenue Code of 1954.
   "*3. Application.* Subsections 1 and 2 shall not apply to any trust to the extent that a court of competent jurisdiction shall determine that such application would be contrary to the terms of the instrument governing such trust and that the same may not properly be changed to conform to such subsections.
   "*4. Impairment.* Nothing in this section shall impair the rights and powers of the courts or the Attorney General of this State with respect to any trust.
   "*5. References.* All references to sections of the Internal Revenue Code of 1954 shall include future amendments to such sections and corresponding provisions of future internal revenue laws."

■ No contention is presently made that the application of subsection 1 to the instant trusts would be contrary to the terms of any governing instrument, and we discern no problem in this respect. Accordingly, we hold that by operation of Section 3956 all of the governing instruments of the trusts are deemed to include among their provisions the prohibitions specified in subsection 1 of Section 3956 (these being the so-called "wheeling and dealing" abuses comprehended within the first category of Tax Reform Act "private foundation" rules).

The question remaining is whether the trust instruments are also to be held to be deemed to incorporate the substance of subsection 2 of Section 3956 which embodies the adequate distribution to beneficiaries requirements specified by the federal "private foundation" rules. This question is of immediate importance to the trustees of the instant trusts since failure of the trustees to make the distributions required by the "private foundation" rules can cause the trusts to lose exemption from federal income taxes and to become subject to imposition of penalty taxes and a termination tax which can exhaust all the assets of the trusts.

To refine the matter further, the trustees are here particularly in need of instructions concerning whether the substance of subsection 2 of Section 3956 is included among the provisions of the governing instruments of the trusts because the trustees of each of the trusts project that in the immediate future they can fulfill the requirements of the "private foundation" rules for adequate distributions to beneficiaries only by invading corpus. Thus, the application of subsection 2 of Section 3956 to each of the trusts would have the effect of requiring the use not only of income but also of principal as it may be necessary to achieve adequate distributions to beneficiaries. None of the governing instruments of the trusts under scrutiny expressly authorizes the invasion of principal. Hence, the trustees seek instructions that subsection 2 of Section 3956 is deemed incorporated into each governing instrument—notwithstanding that an obligation, and authority, to use principal would thereby become incorporated into each governing instrument—on the theory that either (1) such authorization to use principal is not "contrary to the terms of the instrument governing such trust" or (2) the "terms", if any, contravened "may . . . properly be changed . . . ."

*III—Evaluation of the Trusts Relative to the Adequate Distribution Requirements*

The governing instruments of the Turner and Kennedy Trusts affirmatively direct that distribution shall be made from income. They omit, however, any express language confining the trustees to distributions from income or prohibiting distributions from principal. In the Davenport Trust, by contrast, there is an explicit direction limiting the trustees to distribute by the use of "interest *only*." (emphasis supplied) We, therefore, consider the Turner and Kennedy Trusts separately from the Davenport Trust.

■ As to the Turner and Kennedy Trusts we perceive the issue to be whether, even in the absence of particular express language requiring that distribution be made exclusively from income or otherwise prohibiting the invasion of corpus, an equivalent intention of the respective settlors is nevertheless implicitly manifested by the entirety of the provisions of each governing instrument.

We discern no such overall intention in the instruments establishing the Turner and Kennedy Trusts.

The general purpose of the settlors was plainly to further certain charitable purposes in perpetuity through financial assistance. In light of each settlor's indisputable concern to assure benefit to charities, it is unreasonable to attribute to either of them, by a process of negative implica-

tion, a calculated aim to restrict the trustees to the use of income—especially in the face of circumstances in which such restriction is likely to defeat the overall dominant charitable objectives of the settlor.

This conclusion is in accord with decisions of this Court in the leading case of *Elder v. Elder*, 50 Me. 535 (1861) and in *Manufacturers National Bank v. Woodward*, 141 Me. 28, 38 A.2d 657 (1944) in which we refused to imply trust restrictions which would frustrate the general goals of the respective settlors.

Courts of other jurisdictions have reached similar conclusions when the difficulty was, as here, the threat of a substantial tax burden. See, e. g., *In re Estate of Barkey*, 65 Misc.2d 738, 318 N.Y.S.2d 843 (Surr.Ct., N.Y.Co., 1971); *In re Estate of Klosk*, 65 Misc.2d 1005, 319 N.Y.S.2d 685 (Surr.Ct., N.Y.Co., 1971); *United States Trust Company of New York v. Jones*, 414 Ill. 265, 111 N.E.2d 144 (1953).

We, therefore, instruct the respective trustees of the Turner and Kennedy Trusts that each governing instrument is deemed amended to include the provisions of subsection 2 of Section 3956, and the respective trustees have authority to make use of principal to the extent required by the mandates of subsection 2.

■ We reach a similar ultimate conclusion as to the Davenport Trust by adjudicating that on the record before us we find no reason to preclude a reformation of the trust instrument to have it include an exception to the express limitation in the governing instrument that distributions be made from income "only."

Taking the governing instrument of the Davenport Trust in its entirety, we are satisfied that the provision as to use of income "only" was intended as but a single incidental direction to assist in furthering, rather than frustrating, the charitable purposes which were the dominant objectives of the settlor. It is clear from the instrument that the settlor's intention was concerned only with effecting gifts to charity; no life income beneficiaries make claims on the settlor's bounty equal to those of the charitable beneficiaries, thus to prevent modification. In this respect, the instant situation differs from that in *Shriners Hospitals for Crippled Children v. Maryland National Bank*, 270 Md. 564, 312 A.2d 546 (1973) and *Givens v. Third National Bank in Nashville*, Tenn., 516 S.W.2d 356 (1974). We take appropriate guidance, here, from *Mann v. Mann*, 122 Me. 468, 120 A. 541 (1923) in which we ordered the sale of trust assets, notwithstanding express *particular* direction by the settlor to the contrary, because his *general* object was to provide suitable income for the beneficiaries, and sale of trust assets best served that purpose.

■ It is well settled that a Court possessing equitable powers (as does each of the lower courts in these cases) may in its discretion modify trust administrative provisions. *Elder v. Elder*, 50 Me. 535 (1861). This Court has always permitted such modifications if (1) consistent with the settlor's primary intent, *and* (2) required by necessitous circumstances, *Elder v. Elder*, supra; see also: *Porter v. Porter*, 138 Me. 1, 20 A.2d 465 (1941). Although Section 3956 permits its modifying provisions to operate without specific requirements that necessitous circumstances be shown, the threat of the Tax Reform Act penalties applicable upon noncompliance with its provisions per se constitutes necessitous circumstances.[7]

7. Analogous to a court-ordered deviation from the express provisions of a trust instrument are the numerous cases in which there has been a resort to the "cy pres" doctrine. See, e. g., *Robert W. Traip Academy v. Staples*, Me., 317 A.2d 816 (1974). In the deviation situation trustees are permitted to administer a private or charitable trust in some way contrary to a particular direction of the settlor; in cy pres the court may sometimes order application of the charitable gift to a different object of a similar character. We

In *Davison v. Duke University*, 282 N.C. 676, 194 S.E.2d 761 (1973), a case involving circumstances closely similar to those now before us, the Supreme Court of North Carolina[8] upheld a lower court order enabling the trustees of a trust subject to the "private foundation" rules of the Tax Reform Act to disregard express trust terms in order to comply with the Tax Reform Act and avoid its confiscatory penalties.[9]

We adjudicate, therefore, that nothing in the record presently before us precludes (1) a modification of provisions in the governing instrument of the Davenport Trust limiting distributions to income "only" to render the limitation subject to the exception that the trustees may use principal to the extent necessary to effect compliance with the mandates of subsection 2 of Section 3956; such that (2) the provisions of said subsection 2 may then be deemed incorporated in the governing instrument of the Trust and the trustees will be authorized to use principal to carry out the mandates of said subsection 2.

### IV—The Issue of the Methodology for Application of Section 3956.

The foregoing analysis has exposed a problem of methodology precipitated by subsection 3 of Section 3956 in that under its provisions the incorporation of subsections 1 and 2 into the governing instrument of a charitable trust can be affected to the "extent" that

" . . . a court of competent jurisdiction shall determine that such application would be contrary to the terms of the instrument governing such trust and that the same may not properly be changed to conform to such subsections."

Does subsection 3 contemplate that in each and every case the trustees of a charitable trust must achieve a Court determination negativing the propositions set forth in subsection 3 as a precondition of having subsections 1 and 2 incorporated? Or are subsections 1 and 2 automatically incorporated into the governing instruments of charitable trusts by operation of Section 3956 alone, without need for a Court determination to that effect—except in those special cases in which the instruments contain particular express provisions plainly contrary to the substantive requirements of subsections 1 and 2?

The Attorney General has here argued for the former methodology, the trustees of the respective trusts for the latter.

■ The trustees maintain that the language in subsection 3, "contrary to the terms of the instrument", must be taken to mean "specifically forbidden by it." They buttress this interpretation by pointing to the principle traditionally recognized in trust law that in the absence of clear and unalterable provisions to the contrary, a trust direction that a fund be held for the benefit of a charity requires trustees to prevent forfeiture of the trust estate and to use corpus, if necessary, to carry out the charitable purpose of the settlor.

■ We agree with the position of the trustees.

We are satisfied that the Legislature intended Section 3956 to have automatic, self-effectuating force in that great majority of cases in which there would be little doubt that a Court, applying the doctrines elucidated by *Elder v. Elder*, supra, and its progeny, would by its decision produce the

noted the close relation of the two doctrines in *Manufacturers National Bank v. Woodward*, 141 Me. 28, 31, 32, 38 A.2d 657 (1944) and recognized that under either principle the proposed modification must comport with the underlying wishes of the settlor.

8. It is unclear whose law the *Davison* decision reveals. Purporting to apply New Jer-

sey law, the North Carolina Court did so only on the assumption that New Jersey law did not differ from North Carolina law.

9. The Court in *Davison* reversed a portion of the lower court order aimed at saving taxes which, unlike the Tax Reform Act penalties, did not threaten the existence of the trust.

same result. We see the objective of Section 3956 as calculated, generally, to minimize the potentially severe impacts of the Tax Reform Act on the administration of charitable trusts and, in particular, to eliminate the expenses of court litigation which will produce, in substance, nothing more than "rubber-stamping" adjudications.

Failure to comply with the Tax Reform Act on the part of charitable trusts like those before us would ultimately result in their termination and payment of their assets to the federal government. The enactment of Section 3956 represents a legislative effort to prevent the loss to the people of this State of an incalculable amount of money dedicated to charitable purposes. It is equally apparent that *automatic* inclusion in governing instruments of the amendments of Section 3956 designed to prevent such losses, without the necessity of judicial intervention, would prevent further losses in the form of expenses of litigation. Such saving of costs of litigation is an important incident of an overall attempt to ensure that charitable trusts continue to provide maximum benefits to the residents of Maine.

We agree with plaintiffs' assessment that subsection 3 does not mandate judicial intervention but is designed to avoid a possibly unconstitutional application of the statute in the relatively infrequent instances in which, without judicial intervention and the exercise of appropriate judicial power, the across-the-board *legislative* alteration of trust instruments—by the addition of supplementary provisions—might impair the basic expectations of the settlor. Further to assure that there will be no such constitutional impairment Section 3956 contains a special subsection 4, which states:

"4. *Impairment.* Nothing in this section shall impair the rights and powers of the courts or the Attorney General of this State with respect to any trust."

We discern in this provision no generally applicable requirement of routine prior Court approval and find it consistent with the view that Section 3956 operates automatically in the overwhelming majority of cases to incorporate the provision of subsections 1 and 2 without need of judicial action. In those instances in which there is indication of danger of a constitutional violation, or other impropriety, the Attorney General, or any other interested party, is free to institute judicial proceedings and the courts are free to hear them and act. Subsection 4 thus confirms that the judiciary and the Attorney General are always available, as necessary, to bring to bear constitutional, or other, safeguards.

The policy considerations called to our attention by the Attorney General indicate no legislative purpose contrary to a methodology providing an automatic incorporation of subsections 1 and 2 into the large majority of the governing instruments of charitable trusts. These policy factors are that: (1) an automatic application of the statute, permitting as it does invasion of trust principal, will tempt trustees to lower the investment standards imposed on them by 18 M.R.S.A. § 4054; (2) automatic application of the statute may reach trusts able to comply with the provisions of the Tax Reform Act without the amendments of Section 3956; (3) failure to require judicial approval of the application of Section 3956 in each instance will interfere with the Attorney General's performance of his supervisory duties under 5 M.R.S.A. § 194.

We find little cogency in the claim that absence of judicial scrutiny will tempt fiduciaries to act less prudently. The Legislature indicated no presumption to that effect and we refuse to create one judicially. Moreover, fiduciaries are bound by 18 M.R.S.A. § 4054, as noted by the Attorney General, to adhere to high standards in the performance of their duties. Fiduciaries are charged by 18 M.R.S.A. § 4054 to consider "the probable income as well as the *probable safety of their capital."* (emphasis supplied) Hence, the provisions of Section 3956, seeking to avoid possible loss

of all trust assets through failure to comply with federal tax laws, promote adherence on the part of trustees to the dictates of Section 4054 and in no sense tempt them to deviate from its standards. As we have emphasized repeatedly, we find nothing in Section 3956 which closes the doors of the Courts to any interested party, including the Attorney General, in the event of misfeasance on the part of a trustee purporting to act under its authority.

Neither are we troubled by the point that in the administration of a trust into which the substance of subsections 1 and 2 of Section 3956 has been deemed incorporated it may be unnecessary at any given time, or ever, to invade principal. If this argument seeks to maintain that a trustee may validly have only such powers as are continuingly necessary to be exercised, the argument must be rejected out of hand. If the thrust is that the power to invade corpus may encourage unnecessary invasions, we have already rejected such contention.

Finally, the Attorney General complains, without elaboration, that automatic amendment of charitable trusts will frustrate performance of his duties as supervisor of charitable trusts. It may well be (although it is not asserted) that litigation of each case would provide helpful information as to the existence and nature of charitable trusts to the Attorney General. It is not, however, the function of this Court to weigh the relative merits of providing information to the Attorney General and minimizing litigation costs to charities. Rather, it is for the Legislature to decide which consideration shall prevail, and we believe Section 3956 represents a legislative preference for the latter. In any event, the Attorney General in his discre-

tion may at any time bring to the attention of the Courts any charitable trust presenting troublesome circumstances.

Evidence to support our view of the methodology contemplated by Section 3956 appears in a statement by one of the drafters of the model act[10] which Section 3956 parallels. Analyzing the impact of the Tax Reform Act on charitable trusts, Marion R. Fremont-Smith writes:

"Obviously, if such enactments are feasible, a great deal of time, effort and expense will be avoided.

" . . . *the primary value of such a statute will be to obviate the need for court approval of amendments to governing instruments* which do not permit the trustees or directors to amend unilaterally, . . .." (emphasis supplied)

Fremont-Smith, The Charitable Scene in Relation to the Tax Reform Act of 1969, 5 Real Property, Probate and Trust Journal 393, 396, 397 (1970). There is no indication that our Legislature, in adopting the American Bar Association Model Act, was unwilling to share the purpose of its drafters.[11]

We find unpersuasive the suggestions by the Attorney General of potential constitutional infirmities in the methodology we have attributed to Section 3956, that: (1) invasion of corpus without Court approval would impair the obligations of contracts and deny due process of law in violation of the Constitutions of the United States and of the State of Maine;[12] (2) Section 3956, interpreted to allow automatic incorporation of substantive additions to the governing instruments of charitable trusts, is a legislative encroachment upon the judicial

---

10. The text of the proposed model act drafted by a subcommittee of the American Bar Association Section on Real Property, Probate and Trust Law appears at 5 Real Property, Probate and Trust Journal 310E–310F (1970).

11. Defendant Attorney General's attempt to ascertain the purpose of Section 3956 through

comparison with New York and California statutes which do not follow the ABA Model Act is misplaced.

12. United States Constitution, Article I § 10, Amend. 14 § 1; Maine Constitution, Article I § 11.

power relative to the interpretation of trust instruments and the administration of trusts; (3) Section 3956 represents an impermissible delegation to the United States Congress of State legislative authority.

Section 3956 neither purports on its face, nor would this Court apply it in particular circumstances, to cause an impairment of contract or a denial of due process in the form of a deviation from the dominant general charitable purpose of a settlor. Specifically, in the cases now before us, Section 3956, generally, and subsection 3 thereof in particular, prevent significant frustration of the basic purposes of the settlors and, therefore, operate neither to impair contracts nor to deny due process.

That the methodology we have attributed to Section 3956 will in many cases result in a legislatively accomplished addition to the substantive provisions of the governing instruments of charitable trusts, without benefit of a Court determination to such effect, does not unconstitutionally infringe upon judicial power. Plainly, in Section 3956 the Legislature has not denied the right of the judiciary to act in appropriate cases. On the contrary, the Legislature has required judicial action. That, historically, it has been the judicial branch which has most frequently dealt with the administration of trusts must not be misinterpreted to signify that the judicial branch has such power over the subject-matter as to exclude a role for the legislative branch. cf. *State v. Farmer*, Me., 324 A.2d 739, 746 (1974). The Legislature is constitutionally charged with the promotion of the public welfare, and, therefore, has a legitimate concern to ensure that charitable trusts shall be properly and efficiently administered. The Legislature may express and implement this concern, without constitutional violation, by enacting statutes, such as Section 3956, which are reasonably designed to spare charitable trusts unnecessary litigation expenses.

The delegation of State legislative authority to the federal government which is produced by Section 3956 comprises an incorporation of federal laws in effect at the time of the effectiveness of Section 3956 and a reference to future federal amendments. In *State v. Webber*, 125 Me. 319, 133 A. 738 (1926) this Court decided that State legislative incorporation of existing federal provisions is constitutionally permissible. Questions raised by the incorporation of *future* federal law are not presently before us. No claim is made as to an amendment to the existing Internal Revenue laws incorporated into Section 3956 after its enactment in 1971, and our perusal of the pertinent federal statutes reveals none. Hence, we now have no concern with the constitutional validity of Section 3956 conceived as purportedly operative to incorporate future federal law, and we intimate no opinion on the subject.

■ Applying to the Trusts before us our view of the methodology by which Section 3956 operates to incorporate the substance of subsections 1 and 2 (and thereby also to offer guidance to trustees in other cases), we hold that in the Turner and Kennedy Trusts the incorporation of subsections 1 and 2 plainly involves no consequences contrary to particularly expressed terms of the governing instruments and, therefore, subsections 1 and 2 are automatically incorporated by operation of Section 3956 alone. (Although in abundance of caution the trustees here undertook to have a judicial determination to effect such incorporation, they need not have so proceeded).

As to the Davenport Trust, however, its governing instrument contains a particular provision expressly contrary to action which the incorporation of subsection 2 would require of the Davenport trustees. This precludes the automatic self-effectuating operation of Section 3956 to incorporate the provisions of subsection 2 into the governing instrument of the Davenport Trust. It was necessary, therefore, that the trustees make the application, here undertaken, to a Court of competent jurisdic-

tion for a judicial determination modifying provisions of the governing instrument to the extent necessary to prevent inconsistency with the matters mandated by subsection 2—thus to allow subsection 2 to be incorporated by judicial decision.

### V—"Necessary" and "Indispensable" Parties.

For reasons appearing in the ensuing discussion, pending the formulation of our views on the merits of the questions reported we have delayed consideration of a threshold problem precipitated by the omission to name as parties defendant (1) in the "Turner" and "Davenport" proceedings the known heirs of each deceased settlor, and (2) in each of the three cases remaining viable before us all persons unknown who may have an interest in the intestate estate of the deceased settlor and who should be represented by a guardian ad litem. Cf. *Hitch v. Hitch,* Me., 261 A.2d 858, 859 (1970).

These omissions require that we deal with Rule 19 M.R.C.P., the present content of which came into being in 1966 when it was amended, as stated in 1 F.McK. & W. Me.Civ.Pr.2d 366,

" . . . to incorporate changes in the corresponding federal rule that were intended to make the determination of the need for and effects of compulsory joinder both easier and more realistic."

In *Stevens v. Loomis,* 334 F.2d 775 (1st Cir. 1964) the Court anticipated that the most significant change to be effected by the 1966 amendment to federal Civil Rule 19 would be the clarification of the difference between "necessary" and "indispensable" parties. In footnote 7 of the opinion in *Stevens v. Loomis* (p. 778), the Court refers to the extensive re-writing of federal Rule 19 as contained in the Preliminary Draft of Proposed Amendments (published in Vol. 227 F.Supp.). On this basis, the Court analyzed "necessary" and "indispensable" parties as follows:

"Because the classic definition of an indispensable party is one as to whom any judgment, if effective, would necessarily affect his interest, or would, if his interest is eliminated, constitute unreasonable, inequitable, or impractical relief, . . . and the latter question is the same that must be asked when deciding whether to dismiss in the absence of a merely necessary party, where the court concludes not to proceed in the absence of some party there has been a natural tendency to label that party 'indispensable' whether he was truly indispensable or only necessary. Nevertheless there is a difference, as some courts, even while ordering a dismissal, have been careful to point out. . . . Although it would not comport with at least the language of many cases, we think that true indispensable parties are only those whose interests could not be excluded from the terms or consequences of the judgment and leave anything, or appreciably anything, for the judgment effectively to operate upon, as where the interests of the absent party are inextricably tied in to the cause, . . . ., or where the relief really is sought against the absent party alone, . . . .. In other words, *if there may be a viable judgment having separable affirmative consequences with respect to parties before the court, and the inquiry is concerned solely with the inequities, in the light of the total circumstances, resulting from the inability to affect absent interested parties, then such other parties should be defined as merely necessary, not indispensable. The distinction is* . . . *important. If indispensability is determined solely by the nature of the claim, the courts will have broader discretion to find that a particular plaintiff may proceed in the absence of other parties."* (pp. 777, 778) (emphasis supplied)

It eventuated that the Advisory Committee on the Federal Civil Rules was required to abandon its intention, as original-

ly manifested in the 1964 preliminary draft, to omit mention of the concept of a party as "indispensable" (as commented upon in n. 7 of *Stevens v. Loomis,* supra). Insofar, however, as the amendment ultimately adopted preserves, in Rule 19(b), the concept of a party as "indispensable", the amendment makes pointedly clear that the "indispensability" of a party does not derive from a governing criterion delineating a category of fixed rights operating in advance of judgment but is, rather, the conclusory designation attaching *after* the evaluation of various flexible factors has led to a determination that "in equity and good conscience" the action should not proceed.

■ Mindful of this fundamental point, we conclude that the cases now before us involve unique circumstances by virtue of which "in equity and good conscience" we should not discharge the respective reports but should proceed with adjudication. Taking into account, as Rule 19(b) contemplates, the totality of the circumstances before us—including not only the nature of the issues as originally raised but also the likely answers to them—we are satisfied that, in the language of *Stevens v. Loomis,* supra: (1)

". . . there may be a viable judgment having separable affirmative consequences with respect to parties before the court, . . ."

and, (2) since our

". . . inquiry is concerned . . . with . . . inequities, in the light of the total circumstances, resulting from the inability to affect absent interested parties, . . .",

a decision, here, will involve no such inequities.

This is true beyond question in the Turner and Kennedy cases because our ultimate conclusion in each of them is, fundamentally, that the trustees need not, in the first instance, have instituted a judicial proceeding; by the self-effectuating force of Section 3956 the governing trust instruments incorporated the requirements of that statute and thus automatically, without necessity of a "rubber-stamping" judicial adjudication, conferred upon the trustees the authority to invade principal as necessary to fulfill the requirements. Since from the outset the resort to a Court proceeding was unnecessary, it surely does not violate equity and good conscience for us to say so in the (superfluous) judicial proceedings in fact here instituted and in which it has happened that known heirs or unknown persons having a possible interest in the intestate estate of each deceased settlor were not joined as parties defendant.

The Davenport case requires more extended analysis since, there, we contemplate an adjudication holding that a judicial proceeding was necessary to achieve a reformation of the governing instrument of the testamentary trust, thereby to effect incorporation of provisions of Section 3956 and establish consequent authority of the trustees to use principal as necessary to fulfill the incorporated statutory requirements.

The basic inquiry involved in the Davenport case concerns particular aspects of the administration of the Trust to ensure that its assets will continue to provide the charitable benefits intended by the testator rather than to be entirely dissipated through payments of taxes to the United States Government. As to such an issue, the interests of the known heirs of the testator, or of persons unknown, in the intestate estate of the testator are hypothetical in the extreme.

Moreover, since such reformation of the governing instrument of the Davenport Trust as may be necessary must be made by the Superior Court, as the Court having the appropriate equity jurisdiction, we are in any event obliged to remand the case to the Superior Court to effectuate the requisite reformation. This affords us opportunity to produce an adjudication shaped,

consistently with one of the factors expressly mentioned in Rule 19(b), to lessen or avoid potential prejudice to absent parties.

In all of the special circumstances of the Davenport case, therefore, we find that in equity and good conscience we may appropriately order a remand to the Superior Court for further proceedings and, for the guidance of the Superior Court acting upon remand, adjudicate that the record presently before us discloses nothing precluding (1) a reformation of the provisions restricting distributions to "income only" to subject them to the exception that the trustees may use principal to the extent necessary to comply with the provisions of subsection 2 of Section 3956, and (2) the incorporation, thereby, into the trust instrument of said subsection 2 provisions thus to confer upon the trustees authority to use principal as necessary to comply with such provisions.

Upon remand, the Superior Court will have opportunity, before it undertakes to effectuate reformation, to join as parties defendant the known heirs of the testator and persons unknown who may have an interest in the intestate estate and to appoint a guardian ad litem for the unknown defendants. Then, after appropriate hearing, and subject only to the remote contingency of modifications required by any new matter adduced by the known heirs who participate or the guardian ad litem, the Superior Court will be able to effectuate the reformation of the governing instrument of the Davenport Trust according to the principles herein adjudicated.

Accordingly, the entries are:

(1) In *Maine National Bank, Trustee v. Grace Episcopal Church, et als,* (The "Tarbox Trust" case):

Report discharged.

(2) In *Canal National Bank, Trustee v. Old Folks' Home Association of Brunswick, et als* (The "Turner Trust" case):

(a) the provisions of subsections 1 and 2 of the 18 M.R.S.A. § 3956 are adjudged incorporated into the governing instrument of the Trust; and

(b) the trustee is authorized to make payments from principal, as necessary, to fulfill the requirements imposed by said subsection 2 as adjudged incorporated into the governing instrument of the Trust.

(3) In the *Merrill Trust Company, Trustee v. The Inhabitants of The Town of Bucksport, et als,* (The "Kennedy Trust" case):

(a) the provisions of subsections 1 and 2 of 18 M.R.S.A. § 3956 are adjudged incorporated into the governing instrument of the Trust; and

(b) the trustee is authorized to make payments from principal, as necessary, to fulfill the requirements imposed by said subsection 2 as adjudged incorporated into the governing instrument of the Trust.

(4) In *In Re Davenport Trust Fund* (The "Davenport Trust" case):

(a) the case is remanded to the Superior Court for further proceedings, as follows:

(1) The Superior Court shall order all of the known heirs of the testator joined as parties defendant and shall also join as parties defendant persons unknown who may have an interest in the settlor's intestate estate and the Court shall appoint a guardian ad litem to represent the interests of said unknown persons;

(2) after appropriate hearing, and subject only to modifications deemed necessary because of new matter presented by the known heirs who participate or the guardian ad litem,

the Superior Court is to reform the provisions of the governing instrument of the Trust which limit distributions "only" to "interest", or "income" by making such limitations subject to the exception that the trustees have authority to make payments from principal, as necessary, to fulfill the requirements imposed by subsection 2 of 18 M.R.S.A. § 3956; and

(b) upon the entry of an order by the Superior Court reforming the governing instrument of the Trust as aforesaid, the provisions of subsections 1 and 2 of 18 M.R.S.A. § 3956 are thereupon incorporated into said governing instrument and the trustees are authorized to make payments from principal, as necessary, to fulfill the requirements imposed by said subsection 2 as incorporated into the governing instrument of the Trust.

(5) In Canal National Bank, Trustee v. Old Folks' Home Association of Brunswick, et al.; Merrill Trust Company, Trustee v. The Inhabitants of The Town of Bucksport, et al.; and In Re Davenport Trust Fund:
Costs and reasonable fees to counsel for the several parties to be fixed in the respective Probate and Superior Courts and ordered paid by the several Trustees equitably out of the several Trust Funds.

All Justices concurring.