

Wɪʟʟɪᴀᴍ D. Pᴏʀᴛᴇʀ and Bᴏsᴛᴏɴ Sᴀғᴇ Dᴇᴘᴏsɪᴛ and Tʀᴜsᴛ Cᴏ.

*vs.*

Wɪʟʟɪᴀᴍ D. Pᴏʀᴛᴇʀ and Mᴀʀʏ G. Pᴏʀᴛᴇʀ, Iɴ Eǫᴜɪᴛʏ.

Hancock.    Opinion, May 19, 1941.

2

*Verrill, Hale, Dana and Walker and*
*Robert Hale,* of counsel, for plaintiffs.
*Hale & Hamlin,* for defendants.
*William B. Nulty,* for Guardian *ad litem, pro se.*

SITTING: STURGIS, C. J., THAXTER, HUDSON, MANSER, WORSTER, MURCHIE, JJ.

MANSER, J. In September, 1912, William D. Porter by voluntary written assignment and declaration transferred to a trust company, predecessor of the present trustees, securities of the face value of $140,000, in irrevocable trust for his own benefit, to receive the net income during his life, reserving the right to dispose of the trust property by will, or in event of his intestacy, in accordance with provisions stated in the trust declaration. Mary G. Porter, named as a defendant, is a sister of the settlor, and, under certain circumstances, entitled to the trust estate upon his decease.

In 1933 the settlor himself, and the Boston Safe Deposit and Trust Company, by appointment of the Probate Court, became successor trustees.

The authority of the trustees as to investment of the trust funds was defined and limited as follows:

"to invest and reinvest the same and the proceeds therefrom, or any part thereof, and the interest and profits thereon, or any part thereof, only in the bonds of the United States or of any of the States of the United States, or in notes or bonds secured by first mortgage or trust deed on improved real property in any state, or in the bonds of any County, City, School District or other municipality in any State, or in the first mortgage bonds of any corporation of any State upon which no default in payment of interest shall have occurred for a period of five years before the purchase thereof; and to sell, assign, transfer, collect, sue for, foreclose, alter and change the investments of said estate."

There is now presented a bill in equity brought by the trustees, seeking the aid of the court, and as stated in the prayers of the bill, asking,

"That it construe and interpret the provisions of said trust indenture and give the plaintiffs such instructions as may be deemed advisable and necessary with respect thereto.

"That it permit a deviation from the terms of said trust indenture if the said trust indenture cannot be so construed as to permit of the purchase of new issues of corporate first mortgage bonds otherwise deemed by the plaintiffs to be suitable investments.

"That the plaintiffs be empowered to deviate from terms of the trust with respect to investments permitted, and that they be empowered to invest in such kind or type of security and in such manner as is permitted to trustees by the laws of this state and that they be empowered to invest in stocks both common and preferred."

All parties, including the guardian *ad litem* for possible remaindermen, join in the prayers of the bill. The case has been argued *ex parte*, no counsel appearing in opposition to the granting of the prayers of the plaintiffs. This imposes upon the court the duty of particular vigilance, as it is without the benefit of presentation by counsel from a different viewpoint.

That the court has authority to pass upon the questions involved is well established under our equity practice and is specifically granted by R. S., Chap. 91, § 36 X.

Consideration will first be given to the prayer of the bill, asking for authority to deviate from the investment provisions to permit the trustees to have a wider scope of investment, and that corporation stocks in particular may be embraced therein.

The principles which must guide in determination are well settled.

They are tersely stated in Restatement of the Law of Trusts, Vol. I, § 167:

"(1) The Court will direct or permit the trustee to deviate from a term of the trust if owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust; and in such case, if necessary to carry out the purposes of the trust, the court may direct or permit the trustee to do acts which are not authorized or are forbidden by the terms of the trust."

(12b) "The court will not permit or direct the trustee to deviate from the terms of the trust merely because such deviation would be more advantageous to the beneficiaries than a compliance with such direction."

"*Illustration:*

13. A bequeaths money to B in trust and directs that the money shall be invested only in railroad bonds. Owing to developments in the electrical science and industry it appears that bonds of electric companies are as safe an investment as railroad bonds and yield a higher return. The court will not direct or permit B to invest in bonds of electric companies."

Elaboration of these statements is found in the recent works of Scott on Trusts and Bogert on Trusts, fortified with citation of many judicial decisions. Thus we find Scott quoting from *Curtiss* v. *Brown*, 29 Ill., 201, 230 as follows:

"Exigencies often arise not contemplated by the party creating the trust, and which, had they been anticipated, would undoubtedly have been provided for, where the aid of the court of chancery must be invoked to grant relief imperatively required; and in such cases the court must, as far as may be, occupy the place of the party creating the trust; and do with the fund what he would have dictated had he anticipated the emergency . . . . From very necessity a power must exist somewhere in the community to grant relief in such cases of absolute necessity, and

under our system of jurisprudence, that power is vested in the court of chancery."

This author also discusses the situation as to investment in corporate stocks as follows:

"A closer question arises where by the terms of the trust the trustee is forbidden to invest in shares of stock in jurisdictions in which the purchase of such shares would otherwise be a proper trust investment. In such a case the general principle as to permission to deviate from the terms of the trust seems to be applicable. If owing to circumstances not known to the settlor and not anticipated by him compliance with the terms of the trust would defeat or substantially impair the accomplishment of the purposes of the trust, the court may permit a deviation from the terms of the trust."

See Scott on Trusts, pp. 838-841.

So Bogert on Trusts, under the sub-title "Alterations for Mere Convenience" in Vol. III, § 561, pp. 1798-99, says:

"This power to alter is, however, an emergency power, used to prevent a serious failure in trust accomplishment. It is not usable to gain for the cestui slight advantages or to remake the trust into a provision which the court deems better than the gift provided by the settlor. Thus, if a settlor has directed that the funds shall be invested in United States government bonds exclusively, the fact that such investments bring a very low rate of income at a given time will not ordinarily lead the court, on the application of the cestui, to direct the trustee to disregard the settlor's investment clause and to buy other legal investments which yield a higher rate. To follow the settlor's direction will give the cestui some income and all the benefit that the settlor intended him to have.The court will not employ its power of alteration in order merely to increase the

benefits for the cestui and to bring to him a gift which he thinks the settlor should have made him."

It is plain that the situation considered must present an emergency or exigency which menaces the trust estate and the beneficiary. Deviation can be granted only upon a showing of extreme hardship, of virtual necessity, of serious impairment of principal, or of inability to carry out the purposes of the trust.

We find the rule well stated by the annotator in Ann. Cas. Vol. XXXIX, p. 996, in a note to *Johns* v. *Montgomery*, 265 Ill., 21, 106 N. E., 497; L. R. A. 1916 B; 1073, as follows:

"Courts of chancery under their inherent jurisdiction to administer and protect trust estates have the power to break in on and change or modify the terms of a trust imposed by the person creating it, when by reason of necessity arising from unforeseen circumstances, the property held in trust may be lost or wholly fail to answer the purposes of the trust if such a power is not exercised."

"While the power to modify the terms of a trust under certain exceptional circumstances is generally recognized, the courts are slow to exercise it and will do so only when it clearly appears to be necessary."

"The mere fact that a different mode of administering the trust from that prescribed by its creator would result in pecuniary benefit or render its use and enjoyment more convenient to the cestui que trust does not constitute such a necessity as will justify a court of equity in modifying the terms imposed."

Again, in *Cary* v. *Cary*, 309 Ill., 330, 335, 141 N. E., 156, 158, the court said:

"Where a contingency arises, however, such that the estate may be totally lost to the beneficiaries of the trust, a court of equity will not permit such loss for lack of power to modify the terms of the trust. This trust was created by

the donor for the express purpose of providing an income for his grandson during his life and keeping the land together for the benefit of his heirs after the expiration of the trust. The trust will not be modified, in violation of the donor's intention, merely because the interest of the parties will be served by doing so, but only where such action is necessary to preserve the trust estate."

That our own court is in full accord with the foregoing statements of principles is evidenced by the opinions found in *Elder* v. *Elder*, 50 Me., 535; *Emery* v. *Batchelder*, 78 Me., 233 at 240, 3 A., 733; *Mattocks* v. *Moulton*, 84 Me., 545 at 551, 24 A., 1004; *Mann* v. *Mann*, 122 Me., 468, 120 A., 541.

In *Richardson* v. *Knight*, 69 Me., 285, for illustration, because of the showing that the retention of certain stocks would defeat the purpose of the testator, the court directed their sale and the investment in U. S. Bonds, bonds of any of the New England states, or first mortgages on income producing real estate.

That the provisions for investment of the trust property were well advised at the inception of the instrument, is not gainsaid. Neither is it contended that the field allowed for investment is now of such a character or so restricted that it jeopardizes the selection of sound securities at current yields. There appears to be no expectation of a distribution of the trust property in the comparatively near future, and consequently no likelihood that it will be necessary to sell securities at lower values. The increase of income appears to be the chief desideratum, and that solely for the convenience of the present beneficiary.

In argument, much stress is placed upon parlous present-day conditions and the world-wide dislocation of the economic structure, but though all may be constrained to agree, the question here is whether there exists a personal exigency as to the beneficiary of the trust which requires the intervention of

the court to authorize a substantial deviation in the terms of the trust to create a possible larger income.

The trust declaration shows that there is no occasion for retaining any of the principal in cash, and instead there is requirement that all funds be invested. But the trustees, of whom the settlor is one, complain that there is now approximately $42,000 of the trust res in idle funds because of the restrictions of the trust instrument. Yet within the permitted list of investments, it has been and is entirely feasible to make sound commitments, upon a basis which would add at least $1,000 annually to income — an increase of over thirty per cent.

As to the elements of emergency or exigency so far as the beneficiary is concerned, the record is entirely silent. The only information vouchsafed to the court is that the settlor decided to create a voluntary, irrevocable trust for his own benefit, that competent counsel prepared the trust document, that the trust has continued since 1912, that the settlor since 1933 has been a co-trustee. His deposition is before us. In it he discloses nothing about himself except that he has no profession. His age does not appear. It is not shown whether he is married or single, or that he has any financial responsibilities for others than himself. There is no representation as to his health, as to whether he has other property, or as to his ability to earn money by his own endeavors. He does say that "This fund is practically the biggest part of my livelihood" and that the income thereof is some $3,200 a year — and this despite the large proportion of uninvested, idle funds.

It is urged that present-day investment policies for trust funds regard preferred and common stocks as a backlog against anticipated inflation which, if it occurs, would adversely affect the value of low-yield bonds and at the same time increase living costs. The theory propounded is that with an increase in commercial and business activity there may be expected increasing dividend distribution, and purchases of common stocks would augment the trust income. It is unneces-

sary to analyze or discuss this theoretical situation, for reasons already stated.

There is suggestion by counsel that the consent of living parties in interest endows the court with authority to sanction the deviation. But here the parties are submitting to the court for its determination the questions presented. The law grants no power to the parties to alter the terms of the trust, and their agreement that it should be done does not relieve the court of decision. As well said in *City Bank Farmers Trust Co., Trustee v. Smith*, 263 N. Y., 292, 189 N. E., 222, 223, 93 A. L. R., 598, "Consent cannot enlarge nor objection limit the powers of the trustee."

To paraphrase the language of the court in *Gaines* v. *Arkansas Bank*, 170 Ark., 679, 280 S. W., 993 at 996, the case does not present any such exigencies in the administration of the trust as to demand a departure from the language of the instrument in order to conserve what the trustee and the beneficiaries and the court might think a more expedient administration of the trust estate than that outlined and directed by the creator of the trust.

The remaining question is the request for interpretation or construction of a clause of the trust instrument relating to a particular form of security permitted for investment. The language of the document in this respect is,

"to invest and reinvest in [naming certain kinds of investment] or in the first mortgage bonds of any corporation of any State upon which no default in payment of interest shall have occurred for a period of five years before the purchase thereof."

During the past year counsel for the trust company has advised that this phraseology might be held to inhibit the purchase of such first mortgage bonds unless they had been outstanding, without default in interest, for at least five years before their purchase. Under current refinancing of many sound concerns by the redemption of outstanding issues and issuance

of new bonds at lower interest rates, a literal interpretation would prevent the substitution of a security of at least equal value as that surrendered, and issued by the same corporation whose called bonds fully met the test of soundness prescribed.

The court is of opinion that such construction is too narrow and is not in accordance with the intention as expressed in the instrument. Clearly it was the history, record, management, successful operation and financial stability of the corporation which was intended to be tested. Security of principal and income of this form of mortgage bond is shown to be the real purpose in mind.

In *Title Guarantee & Trust Co.* v. *Bedford*, 125 Conn., 349, 5 A. (2d), 852, 853, 122 A. L. R., 654, a similar situation was postured, where the trustees were authorized to invest in the "Preferred shares of industrial corporations, upon which the full prescribed dividend shall have been paid each year for five years next preceding such investment" and the question was whether it was permissible to invest in an issue which has replaced another, the difference being that the second issue bore a lower dividend rate. The court held that such new stock met the requirements of the instrument.

Confining authorization in this particular to investment in first mortgage bonds of corporations which, either by the original or refunding issue, have a clear record as to payment of interest without default for a period of five years before purchase, and in which the ratio of value of mortgaged property to debt secured is at least equal to that in any precedent issue, will meet the intent and requirement of the trust instrument.

The cause is returned to the court below for decree in accordance with this opinion, and for determination as to costs and counsel fees.

*Mandate to issue accordingly.*