2008 ME 51

**CITY OF AUGUSTA**

v.

**ATTORNEY GENERAL et al.**

Supreme Judicial Court of Maine.

Argued: Jan. 16, 2008.

Decided: March 18, 2008.

Eric M. Mehnert, Esq. (orally), Hawkes & Mehnert, Bangor, ME, for Patricia Marvin.

584 ▮

Stephen E.F. Langsdorf, Esq. (orally), Jonathan G. Mermin, Esq., Preti, Flaherty, Beliveau & Pachios, LLP, Augusta, ME, for the City of Augusta.

G. Steven Rowe, Attorney General, Christina M. Moylan, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, ME, for the Attorney General.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

ALEXANDER, J.

[¶ 1] Patricia Marvin, an intervenor in this action, appeals from a summary judgment entered by the Superior Court (Kennebec County, *Marden, J.*) in favor of the City of Augusta, authorizing modification of the terms of the Cony Charitable Trust. Marvin argues that the court (1) erred in granting summary judgment when material facts are in dispute; (2) violated her due process rights when it admitted the City's supplemental affidavits and relied upon inadmissible evidence; and (3) erred in applying 18–B M.R.S. § 412 (2007) to authorize modification of the terms of the Trust, rather than older case law governing the doctrine of equitable deviation. We affirm the judgment.

## I. CASE HISTORY

[¶ 2] In 2005, the City filed a complaint against the Attorney General, pursuant to 5 M.R.S. § 194 (2007),[1] seeking leave to modify the terms of the Cony Charitable Trust to permit the City to sell the property upon which the original Cony High School was located, remove all restrictions from that property, and use the sale proceeds to maintain the Trust and benefit the new Cony High School. Marvin, a descendant of the original settlor of the Trust, was allowed to intervene pursuant to M.R. Civ. P. 24(a).

[¶ 3] The City moved for summary judgment in December 2006. The City's motion was supported by the requisite statement of material facts, *see* M.R. Civ. P. 56(h)(1), that was reliant on affidavits of William Bridgeo, the City Manager, and William Sprague, a real estate agent in the Augusta area, as well as the City's answers to interrogatories.[2] Marvin objected to significant portions of the City's statement of material facts as hearsay, but offered no alternative facts, supported by any affidavits or record citations, to counter the facts cited by the City. The following historical facts, about which there can be little legitimate dispute, are derived from Marvin's brief and the materials filed by the City.

[¶ 4] On December 25, 1815, Daniel Cony conveyed a parcel of land, located in Augusta, to five named individuals in trust "for the use and benefit of aiding and supporting a female academy on the site."[3] In 1825, Cony transferred a second parcel

---

**1.** The action was initiated against the Attorney General because the Attorney General has the statutory and common law duty to protect the community interest in proper use of charitable trust proceeds, enforcement of the terms of charitable trusts, and amendment of charitable trusts to assure proper consideration of the charitable purposes of the trust as circumstances change. *See In re Estate of Thompson,* 414 A.2d 881, 890 (Me.1980).

**2.** The Attorney General objected to the foundation for much of the City's statement of

material facts. Subject to these objections, the Attorney General admitted most of the City's facts.

**3.** The document creating the Trust states, "[a]fter mature consideration and from a desire to contribute something for the establishment of a Female Academy in the town of Augusta, to be and remain in the premises described and conveyed by this deed for that purpose."

of land to the Trustees of the Cony Female Academy, to be included as part of the Trust.[4] The Trustees administered the Trust and operated the school until 1844. The Trustees then leased the school buildings and grounds to a private individual, who operated the Academy until 1876. In 1880, the Academy entered into a long-term lease with the City, authorizing the City to manage the property and administer a new school upon it, called the Cony Free High School.

[¶ 5] In 1908, the Trustees of the Academy petitioned this Court to permit them to transfer the Trust's assets to the City.[5] A single justice of this Court, sitting in equity, granted that petition, directing the Trustees of the Academy to transfer all of the Trust's property to the City to be held in perpetual trust by the City "for the purpose of maintaining said High School under its present name of Cony Free High School," and to hold part of the land "spe-cially ... for the purpose of an athletic field and pleasure ground in connection with said Cony Free High School, except so far as it may be necessary to encroach upon the same by additions to, or enlargements or replacements of the present school building." [6] *Trustees of Cony Female Academy v. City of Augusta,* Ken. Cty. Equity No. 469 (June 27, 1908) (*Spear, J.*). This use continued until 2006.

[¶ 6] Presently, there are two buildings on the site, the older "Flatiron Building," which is not being sold, and the "1964 Addition," which is the subject of this litigation. In 2001, the City filed an application to construct a new Cony High School at a new location because of the poor conditions and other defects with the 1964 Addition.[7] Repairs, according to an analysis done by PDT Architects, would exceed the cost of constructing a new building at a new site. Before the property could be used for another purpose, the 1964 Addi-

---

**4.** The document adding to the Trust states, "for the promotion of Female Education in morals, religion and literature, for the accommodation and perpetual use of the Cony Female Academy in Augusta."

**5.** Marvin and the Attorney General admit this assertion subject to the objection that the document in support of it is the affidavit of Bridgeo, not the petition seeking relief, and instead reflects the court order and deed resulting from that petition.

**6.** The parcels conveyed in 1815 and 1825 by Cony to the Trustees were transferred to the City "for the purpose of maintaining under its present name the Cony Free High School," while additional property, later acquired by the Academy from Helen W. Nichols, was transferred "for the purpose of the athletic fields and pleasure grounds."

**7.** At the time, the 1964 Addition had numerous problems, including: electrical and mechanical system problems, lack of a sprinkler system, defective non-insulating exterior shell, partitions and interior finishes that are in disrepair, a roof that needs to be replaced, problems with the floors, shortage of science rooms, moisture leaks in exterior walls, an inadequate gymnasium, and some inoperable windows. Due to its small size, the site has insufficient parking; space for only one athletic field, though seven or eight are required; insufficient space for unloading buses; no visitor or parent drop-off location; inadequate space for vehicles to turn around; and problems regarding delivery and trash removal. The front of the building cannot be made handicap accessible because of the cross slope condition and lack of space between entrances and the street. Additionally, the property is located directly off Cony Circle, a rotary that is among Maine's busiest intersections. Users of the property are exposed to dangerous environmental conditions, including carbon monoxide and lead, due to an antiquated ventilation system that draws exhaust into the building. Too many doorways lead directly onto parking lots. The old site has no restrooms, locker rooms, showers, or first aid services for the single athletic field. As a result of the athletic field shortage, the school had to rent off-site fields and transport students to remote locations.

tion would have to be demolished, at an estimated cost of $1 million.

[¶ 7] The 1964 Addition is located on 6.67 acres of land, which is too small for a high school under current State standards. The only school that is permitted on a parcel this size is an elementary school with no more than 160 students, which the City does not need. These problems and restrictions did not exist in 1815 when the property was first dedicated.

[¶ 8] In 2004, the Augusta City Council formed a committee to investigate the matter and authorized the city manager's office to publish a request for proposals to purchase and redevelop the property. The only party to respond was the Boulos Company, which offered $1.5 million to demolish the 1964 Addition and construct a supermarket. The purchase price was above the fair market value of the property, which was estimated at between $1 million and $1.2 million.[8] The City Council voted in March 2004 to authorize the city manager to enter into a purchase and sale agreement for the property. In June 2004, the City agreed to sell the property, excluding the Flatiron Building, for $1.5 million to Cony LLC.

[¶ 9] Construction of the new Cony High School was complete and the school opened in August 2006. The City has no use for the 1964 Addition. Because the new high school has adequate fields and facilities, the old field, now at some distance from the students, is no longer needed.

[¶ 10] The parties to this litigation, including all intervenors except Marvin,[9] negotiated a settlement agreement that was filed with the court in September 2006. Pursuant to the settlement agreement, all Trust restrictions would be removed from the property and the proceeds from the sale of the 1964 Addition would be used for several defined building improvements, maintenance, and scholarship uses. In its final judgment, the court disapproved portions of this settlement agreement.

[¶ 11] The disputes before the Superior Court focused on evidentiary and procedural issues regarding sufficiency of support for the City's motion for summary judgment. Despite the requirements of M.R. Civ. P. 56(h)(2), (4), Marvin failed to properly admit, deny, or qualify most of the City's statement of material facts.[10] Instead, Marvin objected to Bridgeo's affidavit, asserting that he failed to establish that he was competent to testify, failed to establish that the information he provided was within his personal knowledge, and failed to provide a foundation for his knowledge that was not hearsay. Marvin also objected to the City's valuation of the property, asserting that the City was re-

---

8. The City received this estimated value from William Sprague Jr., who has twenty-eight years of experience in commercial and residential real estate sales in Augusta. Sprague based his estimate on comparable sales in the Augusta area. In making his estimate, Sprague valued the current building as having "no positive value" because the cost of renovating it would be greater than new construction and it is "common" for the cost of tearing down and removing a building to be greater than its salvage value. The "potential political process involved in the purchase of the property" also affected its value.

9. The City's statement of material facts states that all intervenors agreed to the settlement agreement. However, Marvin and the Attorney General both assert that Marvin never agreed.

10. Marvin admitted paragraphs 3–5, 9–11, 27, 32, 42. She qualified paragraph 120. She denied paragraph 39, stating she never agreed to the settlement agreement. Marvin failed to admit, deny, or qualify all remaining paragraphs. Instead, she merely objected and moved to strike them because, she asserted, they were inadmissible.

quired to have a qualified appraiser determine such information.

[¶ 12] A hearing on the City's motion for summary judgment was held on January 31, 2007. The Attorney General did not object to the motion, but did object to the foundation of some of the evidence submitted by the City. After the hearing, on March 15, 2007, the City filed a motion for leave to file the supplemental affidavits of Lyndon D. Keck, partner in charge and project manager for PDT Architects, and Cornelia Brown, Superintendent of Schools for the City of Augusta.

[¶ 13] Marvin objected to the motion to submit supplemental affidavits, arguing that because the City chose to move for summary judgment, it should not be permitted to file supplemental affidavits. Additionally, she contended that the need to file supplemental affidavits supported her view that summary judgment was inappropriate because all the facts had not yet been discovered and more time was needed. However, as with her initial response to the City's motion for summary judgment, Marvin made no effort to present the court with evidence counter to that being offered by the City.

[¶ 14] The court granted the motion for summary judgment on March 30, 2007. The court's judgment indicated that during the hearing on the motion for summary judgment, the Attorney General properly pointed out that many of the City's facts were based on Bridgeo's affidavit and that many of his statements were "not based upon sound and competent knowledge such as would support evidence being offered in any hearing." The court also indicated that when the City requested leave to file supplemental affidavits to address these

deficiencies, the court permitted this request "[i]n the interest of judicial economy."

[¶ 15] The court found from the language of the original deed that Cony intended the property to be held as a charitable trust in perpetuity and forever, and that the property was to be used for a school, especially for young women.[11] The court found that Cony "expressed a specific intent to create in perpetuity a parcel of land upon which would be located a public school for females, as well as athletic fields and playground in support thereof." Based on the undisputed facts, the court found that the land at issue does not meet the "contemporary legal standards" for a high school. Because these facts were unanticipated when the trust was created, the court found that modification was warranted in order to serve the Trust's educational purpose. The court stated that, "any person with a basic education would know that the circumstances of the City . . . as it existed in 1815 are substantially different than those [of today]." The court further noted that the changes were not known or anticipated by Cony and that compliance with the precise terms of the Trust would "defeat or substantially impair the accomplishment of the purpose of his trust."

[¶ 16] The court held that 18–B M.R.S. § 412 modified the common law doctrine of equitable deviation to permit alterations to both administrative and dispositive terms of trusts. Accordingly, the court determined that the real estate will no longer be held in trust or restricted, and can be sold, but that all sale proceeds must be subject to the terms of the Trust and must be applied within those terms. The court rejected some of the provisions

---

11. The court cited to the document that permitted the initial Trustees to transfer the Trust to the City as Trustee, which stated that in order to prevent failure of the Trust and prevent the defeat of Cony's general charitable intent, "education of youth," the Trust was given over to a private individual to run a private school for both sexes.

of the proposed settlement agreement, and therefore, retained jurisdiction in order to ensure the City's plans for the Trust's assets are in conformity with the Trust. Marvin filed this timely appeal.

## II. LEGAL ANALYSIS

[¶ 17] Marvin's arguments put considerable emphasis on her view that the Superior Court erred in (1) considering evidentiary materials that were insufficiently supported; (2) deciding the case by summary judgment when, in her view, material facts remain in dispute; and (3) depriving her of due process by allowing the City to file supplemental affidavits supporting its position. Her arguments ignore the procedural history of the case, which demonstrates that Marvin elected not to avail herself of the ample opportunities to present evidentiary materials to counter the facts asserted by the City, and they ignore the reality that in this case, none of the facts essential to the trial court's decision are seriously in dispute.

[¶ 18] Specifically, there appears to be no basis to dispute the facts that (1) the primary purpose of the Trust was to promote education for high school age students; (2) it is impossible to continue to use the site for a high school; (3) the City has no other education related use for the site; (4) the City would be required to spend a very large sum of money to create other educational, recreational, or park uses on the cite; and (5) the site is difficult and perhaps dangerous for any educational or recreational use because of the heavy traffic on roads abutting the site. With these facts established, the only real issue presented for our consideration is the legal propriety of the Superior Court's decision to permit the real estate to be exempt from the restrictions of the Trust so that it can be sold, with the proceeds from the sale to be dedicated to continuing the Trust's primary purpose of supporting the education of high school age students in the City of Augusta.

[¶ 19] Having stated these preliminary observations about the proper focus of this appeal, we proceed to address in more detail Marvin's contentions on appeal.

### A. Standard of Review

[¶ 20] Summary judgment is appropriate when the parties' statements of material facts and the referenced record evidence demonstrate that no genuine issue of material fact is in dispute, and the moving party is entitled to judgment as a matter of law. *Stanley v. Hancock County Comm'rs*, 2004 ME 157, ¶ 13, 864 A.2d 169, 174. A material fact is one that can affect the outcome of the case. *Farrington's Owners' Ass'n v. Conway Lake Resorts, Inc.*, 2005 ME 93, ¶ 9, 878 A.2d 504, 507. A genuine issue of material fact exists when the fact-finder must "choose between competing versions of the truth." *Id.; see MP Assocs. v. Liberty*, 2001 ME 22, ¶ 12, 771 A.2d 1040, 1044.

[¶ 21] Once a motion for summary judgment, properly supported by a statement of material facts, is filed, the party opposing the motion must meet certain obligations to properly maintain their opposition to the motion, including filing an opposing statement of material facts. M.R. Civ. P. 56(h)(2). "A party's opposing statement of material facts must explicitly admit, deny, or qualify facts by reference to each numbered paragraph, and a denial or qualification must be supported by a record citation." *Stanley*, 2004 ME 157, ¶ 13, 864 A.2d at 174 (quotation marks omitted). Failure to properly respond to a statement of material facts permits a court to deem admitted any statements not properly denied or controverted. *Id.* (citing M.R. Civ. P. 56(h)(4)).

## B. Consideration of the City's Evidence

■ [¶ 22] Marvin argues that the City failed to offer any admissible evidence to prove that the property is not suitable for an alternative educational purpose or as a "pleasure ground or park." Marvin also argues that the City's real estate agent, with twenty-eight years experience, is not qualified to offer his opinion regarding the value of the property because he is not an appraiser. She asserts the City was required to have an appraisal completed and that its failure to do so constitutes reason enough to deny the City's motion.

[¶ 23] Marvin also argues that she was denied due process when the City was permitted to file its supplemental affidavits in support of its motion for summary judgment. Rule 56 authorizes supplemental affidavits, stating that a court may "permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." M.R. Civ. P. 56(e). Despite the provisions of Rule 56(e), Marvin argues that by granting the City's motion, the court denied her an opportunity to confront the witnesses against her and present counter-affidavits or challenge the affidavit's evidentiary sufficiency. Marvin also asserts that the "jurats" at the end of Brown and Keek's affidavits are defective.[12] Based on the fact that the record was devoid of any admissible evidence, Marvin asserts that the court was required to deny the City's motion.

■ [¶ 24] When a hearing is held at which significant rights are at issue, due process requires that parties receive notice, an opportunity to be heard, the right to introduce evidence and present witnesses, and the right to respond. *In re Kristy Y.*, 2000 ME 98, ¶ 7, 752 A.2d 166, 169. Marvin was given notice, and had an opportunity to be heard at the original hearing, to submit affidavits in support of her opposition to the City's statement of material facts, and to respond to the City's supplemental affidavits. Despite these opportunities for opposition, Marvin presented no facts to dispute the facts asserted by the City. It is difficult to see what more was necessary to protect Marvin's due process rights.

■ [¶ 25] Though Brown and Keek's affidavits were submitted forty-three days after the hearing, the Superior Court permitted these filings for reasons of judicial economy. Although parties must ordinarily submit facts in advance of the hearing, we find no abuse of discretion because the City was merely providing additional foundational support for facts previously offered, not additional facts. Moreover, the facts that were established through the supplemental affidavits were not contradicted in any way by Marvin's responses. Although Marvin objected to the affidavits, she never took advantage of the opportunities offered her to contradict the facts asserted by the City. Thus, the court did not abuse its discretion in considering the supplemental affidavits, and Marvin's due process rights were not violated, nor was she prejudiced by the submissions.

■ [¶ 26] As city manager and a custodian of the City's records, Bridgeo was qualified to testify to the conditions of the school and the needs of the City. Addition-

---

12. Maine Rules of Civil Procedure 56(e) requires an affidavit "be made on 'personal knowledge, ... set forth such facts as would be admissible in evidence, and ... show affirmatively that the affiant is competent to testify to the matters stated therein.' " *Buffington v. Arnheiter*, 576 A.2d 751, 752 (Me.1990)

(quoting M.R. Civ. P. 56(c)). Both Brown and Keck are experts. Thus, they are permitted to provide opinions and testify based on information beyond their personal knowledge. *See* M.R. Evid. 702, 703. Therefore, the qualification in their jurats is understandable and their affidavits were admissible.

ally, Keck and Brown's affidavits, which support paragraphs 13–18, 20–25, and 42–43 of the City's statements of material fact, provide sufficient support for the court's finding that an unanticipated change in circumstances occurred and that modification will further the purpose of the Trust.[13] Although the value of the property is not determinative, a real estate agent in Augusta with twenty-eight years of experience is qualified to provide an opinion of the value of the property. Additionally, the trial court could take judicial notice of the State Board of Education School Construction Projects Site Specifications. Section 7(2) of the State's Site Specifications indicates that secondary schools must be "30 acres plus one (1) acre for each 100 students." ME Dep't of Educ. 05 071 CMR 061–7. Thus, there was ample admissible evidence upon which the Superior Court could make its decision.

[¶ 27] In objecting and moving to strike the City's statements of material facts, Marvin failed to deny or qualify many of the City's statements of material facts. Nor did she provide any of her own contradictory facts. Consequently, because the City's evidence was admissible, Marvin is deemed to have admitted all of the City's statements of material facts. See Stanley, 2004 ME 157, ¶¶ 18–19, 864 A.2d at 175 (holding that a party's failure to properly controvert statements of mate-

rial fact results in admission of those facts).

## C. Trust Amendment

■ [¶ 28] Marvin argues that to convert the Trust asset from real property to cash, the court had to find that Cony had a general charitable intent to "provide for the education of the City's youth." She argues that the 1908 final decree held that Cony had a "specific intent for use of the property."[14] Because of this statement, Marvin argues that the court was obligated to conclude that the real estate could not be converted to cash.[15]

[¶ 29] Further, Marvin asserts that although Maine has adopted the Uniform Trust Code, the Code has its origins in the common law doctrine of equitable deviation, which historically only applied to administrative terms. Marvin cites to Porter v. Porter, 138 Me. 1, 20 A.2d 465 (1941), to argue that at common law, modification was only permitted under circumstances of "emergency or exigency," "extreme hardship, of virtual necessity, of serious impairment of principal, or of inability to carry out the purpose of the trust." She asserts that in passing this statute, the Legislature was likely unaware of these requirements and thought it was merely "codi[fy]ing] existing common law." Therefore, she argues that we should continue to apply Porter's stricter standards to our

13. As the project manager of PDT Architects, who oversaw the Cony High School project, Keck is qualified to discuss the current conditions of the high school and estimate the cost of repairs versus new construction. Additionally, as Superintendent of Schools, Brown is qualified to discuss the City's current school needs and State regulations concerning school site selection.

14. Marvin indicates that the court stated that the property was to be "[specially] held by said City in perpetual trust for the purpose of an athletic field and pleasure ground." The Attorney General notes that the 1908 final

decree, referenced by Marvin, only applied to a portion of the real estate held in trust, namely that used for the athletic fields and playground.

15. A general intent is not required in order to apply the doctrine of equitable deviation; it can apply even when the settlor had a narrow intent. Sendak v. Trustees of Purdue Univ., 151 Ind.App. 372, 279 N.E.2d 840, 844 (1972). Thus, Marvin's argument that Cony did not have a general charitable intent, even if accurate, is irrelevant.

review and disregard any perceived changes to the standards for trust modification recently enacted by the Maine Legislature. Legislative change in a law cannot be so cavalierly ignored.

[¶ 30] Maine enacted the Uniform Trust Code, effective July 1, 2005. 18–B M.R.S. § 1104(1) (2007). The statute provides in relevant part:

> **1. Modification or termination.** The court may modify the administrative or dispositive terms of a trust or terminate the trust if, because of circumstances not anticipated by the settlor, modification, or termination will further the purposes of the trust. To the extent practicable, the modification must be made in accordance with the settlor's probable intention.

18–B M.R.S. § 412(1). According to the statute, the Code applies to all trusts created before, on, or after that date. 18–B M.R.S. § 1104(1)(A) (2007). It applies to all judicial proceedings concerning trusts commenced on or after July 1, 2005, 18–B M.R.S. § 1104(1)(B) (2007), "unless the court finds that application of a particular provision of this Code would substantially interfere with the effective conduct of the judicial proceedings or prejudice the rights of the parties." 18–B M.R.S. § 1104(1)(C) (2007).

[¶ 31] Title 18–B M.R.S. § 412 applies to the Cony Trust because the City filed its complaint after July 1, 2005. Section 412 is unambiguous; it permits modification of both administrative and dispositive trust terms or even termination "because of circumstances not anticipated by the settlor" if such modification will "further the purposes of the trust." 18–B M.R.S. § 412(1). Additionally, section 412 requires only that modification be "in accordance with the settlor's probable intention" "[t]o the extent practicable." 18–B M.R.S. § 412(1).

[¶ 32] The Maine Comment to section 412 specifically references *Porter* and indicates that section 412 was intended to expand Maine law beyond *Porter* to permit modification of dispositive terms of trusts and eliminate the requirement that an emergency exist.[16] 18–B M.R.S.A. § 412 (Supp.2004), Maine cmt. Consequently, Marvin's argument regarding *Porter's* emergency or exigency requirement and her distinction between administrative and dispositive terms are inapplicable to the interpretation of section 412.

[¶ 33] The trial court did not err in admitting the City's supplemental affidavits or relying on the City's statement of material facts. Additionally, the court did not err in finding that there were no material facts in dispute regarding whether unanticipated circumstances exist and whether the proposed modification will further the purpose of the Trust. The City of Augusta has undergone drastic changes, unanticipated at the 1815 creation of the Trust, including changes in State requirements, traffic patterns, the size of the community, the needs of the City, site safety, and parking availability. The 1964 Addition has fallen into disrepair. The fact that operation of the high school on these premises is no longer permitted is sufficient to permit the proposed modification, which will further Cony's overriding purpose of educating the youth of the City.

---

16. Comment a of the RESTATEMENT OF LAW (THIRD) TRUSTS § 66 (2003) also indicates emergencies are no longer necessary, and that modification or even termination because of unforeseen circumstances are permitted in order to give effect to what the settlor probably would have intended had he anticipated the change. This includes modification to provisions expressly forbidding the sale of a trust's corpus. RESTATEMENT OF LAW (THIRD) TRUSTS § 66 cmt. b (2003).

Similar modifications were permitted under the even more stringent common law standards of equitable deviation. *See State v. Rand,* 366 A.2d 183, 196–199 (Me. 1976). Consequently, given the unambiguous language of section 412, and the fact that there are no material facts in dispute, the trial court did not commit error in granting the City's motion for summary judgment and approving the modification of the Trust.

The entry is:

Judgment affirmed.