ENTERED JAN 1 3 2015

STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-CV-2014-07 ✓

AMH–CUM–11-13-14

| | |
|---|---|
| Barbara T. Martin, Trustee of the MARY LOUISE MIKOLS LIVING TRUST U/T/D October 17, 2012. | ) ) ) ) |
| Plaintiff/Counterclaim Defendant, | ) ) |
| v. | ) ) |
| CYNTHIA C. HARRIS, ELIZABETH H. MIKOLS, JULIA A. HARRIS, AND APRIL F. PARRAS, et al. | ) ) ) ) ) |
| Defendants/Counterclaim Plaintiffs | ) ) ) |

## ORDER ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND ON CROSS-MOTIONS RELATING TO NO-CONTEST PROVISION

This Order addresses the Motion for Partial Summary Judgment filed by

Defendants/Counterclaim Plaintiffs' Cynthia C. Harris, Elizabeth H. Mikols, Julia A. Harris,

and April F. Parras *et al.* (collectively the "Harris Defendants") on Counts III and V of the

Harris Defendants' Counterclaim, which relate to the terms of Section 6.01 of the Mary Louise

Mikols Living Trust dated October 17, 2012 (the "Trust"). This Order also addresses the

cross-motions for summary judgment that the parties have filed regarding the no-contest

provisions of the Trust.

### I. FACTUAL BACKGROUND

In 2012, Mary Louise Mikols ("Mary Louise") lived and resided in Eagle Lake, Maine.

(Supp. S.M.F. ¶ 1; Opp. S.M.F. ¶ 1.) On or about June 28, 2012, Mary Louise patronized the

office of William Smyth of Smyth and Associates, P.A. located in Kennebunk, Maine to discuss

and seek legal counsel in the revision of her estate plan. (Supp. S.M.F. ¶ 3; Opp. S.M.F. ¶ 3.)

1

At the time of her first meeting with Attorney Smyth, Mary Louise was 84 years old. *Id.* Mary Louise met with Attorney Smyth on three occasions and exchanged a series of phone calls.[1] (Supp. S.M. F. ¶ 6; Opp. S.M.F. ¶ 6.) During the course of these meetings, Attorney Smyth drafted a new last will and testament, as well as several other estate planning documents. (Supp. S.M.F. ¶ 7; Opp. S.M.F. ¶ 7.) Smyth also drafted an *inter vivos* trust to dispose of certain real property and accounts held by Mary Louise. (Supp. S.M.F. ¶ 8.) Mary Louise had concerns that a beneficiary might challenge or contest her estate plan after her death. As a result, Smyth included no-contest provisions in the will and the Trust. (Pl.'s A.S.M.F. ¶ 53; Defs.' Rep. A.S.M.F. ¶ 53.)

The final meeting was held on August 2, 2012. During this meeting, Mary Louise executed the new Last Will and Testament as well as a Durable Power of Attorney naming her daughter, Barbara Martin, as personal representative and attorney-in-fact. (Supp. S.M.F. ¶ 9; Opp. S.M.F. ¶ 9.) According to statements by the parties, the newly executed will was meant to be a temporary document in place only until the Trust and pour-over will were implemented. (Pl.'s A.S.M.F. ¶ 58 Defs.' Rep. A.S.M.F. ¶ 58.)

On or about September 1, 2012, Mary Louise travelled to Kentucky to visit her other daughter, Judith Montoya, and to undergo a routine endoscopy procedure during the visit. (Supp. S.M.F. ¶ 10; Opp. S.M.F. ¶ 10.) However, Mary Louise suffered a reaction from the procedure and fell into a coma. On September 5, 2012, Ms. Martin contacted Attorney Smyth and requested that he send the executed estate planning documents so she could bring them to Kentucky.[2] (Supp. S.M.F. ¶ 11; Opp. S.M.F. ¶ 11.) Smyth responded by emailing Ms. Martin

---

[1] Though her daughter, Barbara Martin, recommended Attorney Smyth, Mary Louise attended all three meetings with Mr. Smyth alone. (Defs.' Rep. A.S.M.F. ¶ 50.)

[2] The parties dispute whether Ms. Martin requested the unexecuted Trust document on September 5, 2012 when she requested the other estate planning documents from Attorney Smyth. (Supp. S.M.F. ¶ 13; Opp. S.M.F. ¶ 13.) Ms. Martin contends that she requested only the executed documents.

2

all of Mary Louise's estate planning documents, including the unexecuted Trust instrument. (Supp. S.M.F. ¶ 14; Opp. S.M.F. ¶ 14.) In said email, Attorney Smyth instructed Ms. Martin how to execute the document if Mary Louise was unable to sign on her own. (Supp. S.M.F. ¶ 15; Opp. S.M.F. ¶ 15.)

Between early September and October 17th, 2012, Mary Louise regained consciousness, but did not execute the Trust document.[3] (Supp. S.M.F. ¶ 16; Opp. S.M.F. ¶ 16.) On October 15, 2012, Mary Louise began to fail rapidly. On or about October 17, 2012, Ms. Martin requested another copy of the unexecuted Trust instrument.[4] (Supp. S.M.F. ¶ 18; Opp. S.M.F. ¶ 18.) Attorney Smyth sent a second email to Ms. Martin instructing her how the Trust should be executed if Mary Louise was unable to sign on her own. (Supp. S.M.F. ¶ 20; Opp. S.M.F. ¶ 20.) Thereafter, on the same day, Barbara Martin executed the Mary Louise Mikols Living Trust on Mary Louise's behalf.[5] (Supp. S.M.F. ¶ 21.) Mary Louise passed away on October 20, 2012. (Supp. S.M. F. ¶ 23; Opp. S.M.F. ¶ 23.)

The Trust was to be funded with various real property and bank accounts held by Mary Louise. However, most of the accounts were either joint accounts or payment on death accounts, which benefited a number of heirs.[6] (Supp. S.M.F. ¶ 22.) Upon Mary Louise's death only three pieces of real property were transferred to the Trust including: the Imperial Beach, California property; a home in Eagle Lake, Maine; and land in Oroville, California. (Supp.

---

[3] The parties dispute the number of days Mary Louise was in a coma. Ms. Martin contends that Mary Louise regained consciousness on September 6, 2012, whereas the Harris Defendants contend that she regained consciousness on September 10, 2012.

[4] The parties dispute whether October 17, 2012 was the first time Ms. Martin had requested the Trust instrument from Attorney Smyth.

[5] Barbara Martin remains unsure of the date the Trust instrument was executed, but admits that it was subsequent to the receipt of the documents from Attorney Smyth. (Opp. S.M.F. ¶ 21.)

[6] The Parties dispute whether enough action was taken by Mary Louise and Ms. Martin to fund the Trust. Ms. Martin claims that the creation of the pour-over will was intended to assist in the funding of the Trust. (Supp. S.M.F.¶ 24; Opp. S.M.F. ¶ 24.)

S.M.F. ¶¶ 32, 33; Opp. S.M.F. ¶¶ 32, 33.) Because the bank accounts failed to transfer into the Trust, the Trust has limited funds to operate.[7] (Supp. S.M.F. ¶ 34; Opp. S.M. F. ¶ 34.)

Following Mary Louise's death, Ms. Martin, as successor trustee under the terms of the Trust, retained Attorney Smyth to assist in the implementation of the Trust. (Pl.'s A.S.M.F. ¶ 61; Defs.' Rep. A.S.M.F. ¶ 61.) Section 5.02 deems the Trust to be in an administrative phase "for a reasonable period of time necessary to complete ☐ administrative tasks." *See* Mary Louise Mikols Living Trust § 5.02. Section 6.01 of the Trust appoints Mary Louise's daughter, Cynthia Harris, as Trustee of the Imperial Beach, California property. In April 2013, Ms. Martin changed the locks on the Imperial Beach property and refused to provide keys to Ms. Harris who intended to occupy the premises pursuant to Section 6.01 of the Trust instrument.[8] (Supp. S.M.F. ¶ 35; Opp. S.M.F. ¶ 35.) Ms. Martin explained to Ms. Harris and her other siblings that she believed the Trust to be in an administrative phase until the Trust could be adequately funded. (Opp. S.M.F. ¶ 39.) On May 7, 2013, Ms. Martin again contacted her siblings and beneficiaries under the Trust and explained that the Trust still did not have enough liquid assets to satisfy its obligations. Ms. Martin recommended that the Imperial Beach property be put on the market and sold.[9] (Supp. S.M.F. ¶ 43; Opp. S.M.F. ¶ 43.)

Ms. Martin asserts that because the Trust is still in the administrative phase pursuant to Section 5.02 of the Trust instrument, the Harris Defendants are not entitled to occupation or

---

[7] Ms. Martin asked the beneficiaries of the payment on death and joint accounts to return the sums to fund the Trust. Ms. Martin contends that the beneficiaries refused. (Pl.'s A.S.M.F. ¶ 60; Defs.' Rep. A.S.M.F. ¶ 60.) The beneficiaries contend that they did not have enough information from Ms. Martin to contribute their funds to the Trust. (Defs.' Supplemental S.M.F. ¶ 24.) Ms. Martin further qualifies this fact by indicating that the Trust has remained unfunded since Mary Louise's death and because no beneficiaries were willing to return their funds, Ms. Martin has had to administer the Trust with no liquid assets.

[8] Ms. Martin alleges that she sought to prevent all trespassing from the property and did not specifically exclude Ms. Harris. (Opp. S.M.F. ¶ 34.)

[9] The email correspondence from Ms. Martin to her siblings recommends that the property be sold, but also asks for alternative suggestions on how they might hold onto the property. (Supp. S.M.F. ¶ 43; Opp. S.M.F. ¶ 43.)

4

use of the real property held by the Trust. The Harris Defendants claim that the provisions of the Trust are not contingent on completion of the administrative phase and allege that the trustees of the sub-trusts were entitled to the trust property immediately upon the death of Mary Louise.

## II. STANDARD OF REVIEW

M.R. Civ. P. 56(c) instructs that summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . show that there is no genuine issue as to any material fact set forth in those statements and that any party is entitled to a judgment as a matter of law." To survive a motion for summary judgment, the opposing party must produce evidence that, if produced at trial, would be sufficient to resist a motion for a judgment as a matter of law. *Rodrigue v. Rodrigue*, 1997 ME 99, ¶ 8, 694 A.2d 924. For purposes of summary judgment, "[a] material fact is one that can affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573 (citing *Kenny v. Dep't of Human Services*, 1999 ME 158, ¶ 3, 740 A.2d 560); *see also McIlroy v. Gibson's Apple Orchard*, 2012 ME 59, ¶ 7, 43 A.3d 948. A genuine issue exists when sufficient evidence supports a factual contest to require a fact-finder to choose between competing versions of the truth at trial. *See Prescott v. Tax Assessor*, 1998 ME 250, ¶ 5, 721 A.2d 169 (citing *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990)).

A party wishing to avoid summary judgment must present a *prima facie* case for each element of a claim or defense that is asserted. *See Reliance Nat'l Indem. v. Knowles Indus. Services*, 2005 ME 29, ¶ 9, 816 A.2d 63. "If material facts are disputed, the dispute must be resolved through fact-finding." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18. When the court rules on a motion for summary judgment, "'[it] is to consider *only* the portions of the record referred to, and the material facts set forth, in the Rule 7(d) statements.'" *Handy Boat Serv., Inc. v. Prof'l*

5

*Services, Inc.*, 1998 ME 134, ¶ 16, 711 A.2d 1306 (quoting *Gerrity Co. v. Lake Arrowhead Corp.*, 609 A.2d 293 (Me.1992)). The court will view the evidence in light most favorable to the non-moving party. *See, e.g., Steeves v. Bernstein, Shur, Sawyer & Nelson, P.A.*, 1998 ME 210, ¶ 11, 718 A.2d 186. The parties in this case agree that the Mary Louise Mikols Living Trust is governed and enforced in accordance with the laws of the State of Maine.

### III. ANALYSIS

The Harris Defendants' Motion for Partial Summary Judgment focuses on Count III of their Counterclaim, alleging breach of trust pursuant to Maine Revised Statutes §§ 801-813, and Count V of their Counterclaim, seeking a declaration that Cynthia Harris's interest as trustee in the Imperial Beach property vested immediately upon the death of the grantor and that Plaintiff/Counterclaim Defendant ("Barbara Martin" or "Ms. Martin") lacks authority to sell the property.

During the briefing process, Barbara Martin and the Harris Defendants have also asserted cross-motions on the no-contest provisions of the Trust and will. The two issues are addressed in the order just framed.

A. <u>Authority of the Administrative Trustee Regarding the Imperial Beach Property</u>

The crux of the parties' legal dispute lies in their differing interpretations of how the Trust operates. The Harris Defendants suggest that the Trust instrument unambiguously vested title to the Imperial Beach, California property in Cynthia Harris immediately upon Mary Louise's death. Conversely, Ms. Martin contends that Section 5.02 of the instrument has locked the Trust in an administrative phase until such time as it is adequately funded. Acting as trustee, Ms. Martin has proposed that the Imperial Beach property be sold to fund the Trust.

6

### i. Interpretation of the Trust Instrument

Pursuant to the Maine Uniform Trust Code, "[t]he rules of construction that apply in this State to the interpretation . . . and disposition of property by will also apply to the interpretation of the terms of a trust and the disposition of trust property." 18-B M.R.S. §112. Further, the general rules of construction, which apply to deeds and contracts, also apply to trusts. *See In Re Ross Family Trusts*, 2002 ME 89, ¶ 5, 797 A.2d 1268. In construing a will, a court must give effect to the testator's intent, as expressed by the language of the will. 18–A M.R.S. § 2–603. In other words, "[a] court must interpret the will within the four corners of the document but may use the context of the entire will to interpret specific sections." *Estate of Silsby*, 2006 ME 138, ¶ 15, 914 A.2d 703; *Cassidy v. Murray*, 144 Me. 326, 328, 68 A.2d 390, 391 (1949) (intention of settlor must be found from the language of the will read as a whole); *Skillin v. Skillin*, 133 Me. 347, 350, 177 A. 706, 707 (1935) (A trust instrument "must be construed as an entirety and in such manner as to give life to all its parts"). The settlor's intent is "gathered from the whole will." *In re Pike Family Trusts*, 2012 ME 8, ¶ 7, 38 A.3d 329, (quoting *Univ. of Me. Found. v. Fleet Bank of Me.*, 2003 ME 20, ¶ 10, 817 A.2d 871).

The proper interpretation of unambiguous language in a will is a question of law. *Lord v. Soc'y for the Pres. of New Eng. Antiquities, Inc.*, 639 A.2d 623, 624 (Me. 1994); *In re Estate of Hodgkins*, 2002 ME 154, ¶ 8, 807 A.2d 626; *Langille v. Norton*, 628 A.2d 669, 670 (Me. 1993); *Reed v. A.C. McLoon & Co.*, 311 A.2d 548, 551 (Me. 1973); *Susi v. Davis*, 133 Me. 354, 362, 177 A. 610, 613 (1935).

The Law Court has long held that "[a] testator is presumed to use words in their ordinary meaning, if such a construction would not be in conflict with his manifest intention." *Osgood v. Lovering*, 33 Me. 464, 464 (1851); *Lyon v. Lyon*, 88 Me. 395, 400, 34 A. 180, 183 (1896). However, when language in a will is ambiguous or subject to two or more

7

interpretations, the Law Court has stated that "[e]xtrinsic evidence may be admitted to resolve any ambiguity in the will." *Estate of Leighton*, 638 A.2d 723, 724 (Me.1994). There is, however, "a clear distinction between the admission of extrinsic evidence of *facts and circumstances* existing at the time of the execution of the will and the admission of *testator's declaration of intent*," the former being admissible and the latter inadmissible. *First Portland Nat'l Bank v. Kaler-Vaill Mem'l Home*, 155 Me. 50, 62, 151 A.2d 708, 715 (1959) (emphasis in original).

### ii. The Operation of the Mary Louise Mikols Living Trust

In accordance with the well-established principles set forth above, the court looks to the settlor's intent at the time the Trust was executed. Looking at the instrument as a whole, it is clear that Section 3.03 of the Trust unequivocally appoints Barbara Martin as successor trustee of the Trust.[10] In such position, Ms. Martin was conferred the discretionary power to pay from Trust property the following: expenses from settlor's last illness, funeral, and burial or cremation, including expenses of memorials and memorial services; legally enforceable claims against settlor or settlor's estate; expenses relating to the administration of the Trust and settlor's estate; and court-ordered allowances for those dependent upon the settlor. *See* Mary Louise Mikols Living Trust § 5.03. It is further undisputed that upon Mary Louise's death, Section 5.02 of the Trust established an "administrative trust" for the specific purposes set forth in Article Five:

**Section 5.02 Administrative Trust**:

After my death and before the distribution of trust property as provided in the subsequent Articles of this trust, the trust will be an *administrative trust*, but may

---

[10] **Section 3.03 Trustee Succession after My Death**
After my death, this Section will govern the removal and replacement of my Trustees.
   **(a) Successor Trustee**
I name the following to serve as successor Trustees after my death, replacing any then serving Trustee, in the order named:
         Barbara T. Martin; then
         Judith E. Montoya; and then
         Paul J. Martin.

continue to be known as the Mary Louise Mikols Living Trust. The administrative trust will continue for a reasonable period of time necessary to complete the administrative tasks set forth in this Article.

Considering the plain and ordinary meaning of Section 5.02, it is clear that Mary Louise intended to establish an administrative phase to ensure that certain administrative tasks be completed before the distribution of Trust property. The administrative trust is to continue for a reasonable period until such time as the tasks set forth in Article 5 are complete. To date, the Trust remains unfunded. To fund the Trust, Ms. Martin has asked beneficiaries of Mary Louise's pay-on-death accounts to return funds to the Trust and has recommended that the Imperial Beach property be sold to fund the Trust. (Supp. S.M.F. ¶ 43; Opp. S.M.F. ¶ 43.)

The Maine Law Court has long held that, "the chief issue is to be determined from the intent of testatrix, not to be resolved by study of separate clauses, sentences, and paragraphs by themselves, but by orienting the problem to the entire instrument." *Thaxter v. Fry*, 222 A.2d 686, 688 (Me. 1966). Thus, in reading the four-corners of the instrument and interpreting the document as a whole, the court must also look to the plain language of Section 6.01. Said Section unambiguously establishes a sub-trust for real property located in Imperial Beach, California, and appoints Cynthia Harris as the sole trustee.[11]

The Harris Defendants rely on generally accepted rules of construction noting, "[w]here a word is used in one sense in one part of a will, and there is nothing to indicate a different meaning when the same word is used in another part, it may be presumed that the same meaning was intended." *Blaine v. Dow*, 111 Me. 480, 482, 89 A. 1126, 1128 (1914). Here,

---

[11] **Section 6.01 Specific Distribution to Trust Share for Cynthia C. Harris**
After my death, Cynthia C. Harris, as Trustee, shall hold my real estate located in Imperial Beach, California in trust for the use of my descendants. I specifically authorize Cynthia C. Harris to occupy the property as her primary residence, should she wish to do so. It is my desire that my Trustees permit my descendants to vacation at the property at such times as may be mutually agreed upon by my Trustees and those of my descendants who wish to use the property. After a period of five years following my death, my Trustees, by unanimous agreement, may sell the property and distribute the proceeds to the trust share established for Cynthia C. Harris under Article Seven.

9

Mary Louise utilized the phrase "[a]fter my death" at the beginning of both Sections 5.02 and 6.01. However, in other similar provisions of the Trust, Mary Louise began the sections with the language "[a]s soon as practicable after my death." *See, e.g.,* Mary Louise Mikols Living Trust § 6.02. The Harris Defendants contend that this change in language is demonstrative of the settlor's intent that Cynthia Harris was to be vested immediately as trustee of the Imperial Beach property notwithstanding the administrative phase.

While Defendants' argument is persuasive, the court cannot ignore the controlling language in Section 5.02 which states, "[a]fter my death and *before* the distribution of trust property as provided in the *subsequent Articles* of this trust. . ." (emphasis added). This indicates that Section 5.02 must be satisfied prior to the distribution of Trust property provided in subsequent sections, including Section 6.01 regarding the Imperial Beach property. Thus, the administrative phase shall continue for a reasonable period of time until the Article Five obligations can be carried out.

For that reason, Defendants are not entitled to summary judgment on whether Cynthia Harris was vested with immediate possession as trustee of the Imperial Beach property. Control over that property remains with Barbara Martin as administrative trustee until the property is distributed. The court has considered whether to render judgment against the Harris Defendants on this issue, *see* M.R. Civ. P. 56(c) ("summary judgment, when appropriate, may be rendered against the moving party"), and elects not to, mainly because whether Ms. Martin is justified in not having distributed the Imperial Beach property already to Ms. Harris cannot be determined on the present record.

The next question is whether the Imperial Beach property may be sold in order to fund the administrative phase of the trust. For the reasons that follow, the court's answer to that question is, maybe, but not yet.

10

### iii. Authority of the Trustee to Sell Trust Property To Fund the Administrative Trust

Maine has limited case law defining the authority of the trustee of an "administrative trust." Thus, the court looks to the case law of sister states for guidance. Massachusetts, for example, limits the powers of an administrative trustee to ministerial tasks. *See Boston Safe Deposit & Trust Co. v. Stone*, 203 N.E.2d 547, 552 (Mass. 1965) ("Administrative trust provisions . . . are ordinarily designed merely to simplify distribution and to make unnecessary requests for court instructions. Such a provision gives to trustees no discretion to shift beneficial interests in the trust assets.").

Here, Ms. Martin contends that Mary Louise intended that the Trust be implemented in discrete phases, beginning with the administrative phase and progressing to the sub-trusts listed in Article Six. The Harris Defendants argue that notwithstanding Section 5.02, general principles of trust law dictate that specific dispositive provisions should take precedence over general administrative provisions.

The Harris Defendants cite *The Restatement (Third) of Property (Wills & Don. Trans.)* § 11.3 (2003), which states that in construing donative documents, "[t]he foundational constructional preference is for the construction that is more in accord with common intention than other plausible constructions." The Restatement goes on to explain:

> Constructional preferences derived from the preference for common intention include the constructional preferences for . . . the construction that is more in accord with the donor's general dispositive plan than other plausible constructions [as well as] the construction that renders the document more effective than other plausible constructions, including the construction that favors completeness of disposition and the construction that avoids illegality.

*Id.* at § 1103 (c)(1)-(6).

In this case, while the Trust remains unfunded and in an administrative phase, denying Cynthia Harris the possession and use of the Imperial Beach property prohibits and impedes

11

the efficient distribution of the Trust. Further, Section 5.02 does not give Ms. Martin the authority as trustee to sell the Imperial Beach property or any other property that was granted by the settlor to designated beneficiaries.[12] Section 12.01 specifically prohibits any trustee from exercising any power inconsistent with the beneficiaries' right to enjoyment of the Trust property.

Section 6.01 provides Ms. Martin, as successor trustee, the authority to sell the Imperial Beach property *only* after a period of five years following Mary Louise's death and by unanimous agreement among the trustees. Neither of these conditions has been satisfied. Further, a plain reading of the Trust instrument makes clear that any proceeds derived from the sale of the property are to be contributed to Cynthia Harris' trust share. Because Ms. Martin does not, at this time, have the authority to sell the Imperial Beach property and because all proceeds from the sale of the property are to be distributed to the trust share established for Cynthia Harris, the Court sees no reason for Ms. Martin to continue to hold the property.

### iv. A Court-Ordered Sale To Fund the Administrative Trust

The fact that Barbara Martin does not have authority today to sell the Imperial Beach property without the consent of the Harris Defendants does not mean that she is without recourse to fulfill her responsibilities as administrative trustee.

Maine courts have exercised their equitable powers to approve modifications or deviations from the terms of a trust due to unanticipated circumstances. *See e.g., Richardson v. Knight,* 69 Me. 285, 287 (1879) (allowing stocks to be transferred into more stable securities absent language in the testamentary instrument); *City of Augusta v. Attorney Gen.,* 2008 ME 51, ¶ 31, 943 A.2d 582, 591 (granting modification to both administrative and dispositive terms of

---

[12] While other sub-trusts were created in Article Six of the Trust instrument those properties are outside of the scope of the considered motions.

12

the Cony Charitable Trust allowing the City of Augusta to sell the property upon which the original Cony High School was located).[13] Pursuant to 18-B M.R.S.A § 412 (1):

> **Modification or Termination:** The court may modify the administrative or dispositive terms of a trust or terminate the trust if, because of circumstances not anticipated by the settlor, modification or termination will further the purposes of the trust. To the extent practicable, the modification must be made in accordance with the settlor's probable intention.

This statute applies to all trusts created "before, on, or after July 1, 2005." 18-B M.R.S.A § 1104(1)(A).

Section 412 is unambiguous. It permits modification of both administrative and dispositive trust terms in the event of unanticipated circumstances. Any modification or termination must be made, if at all practicable, in accordance with the settlor's intent. *Id.; City of Augusta*, 2008 ME 51, ¶ 31, 943 A.2d 582. Further, the Maine Comments to Section 412 indicate that Section 412 "was intended to expand Maine law beyond *Porter* to permit modification of dispositive terms of trusts and eliminate the requirement that an emergency exist."[14] *Id.* ¶ 32.

Thus, while the court recognizes that the Imperial Beach sub-trust became effective upon the death of Mary Louise, notwithstanding the administrative trust in place, the court also leaves open the possibility that the Imperial Beach property will need to be sold as the result of unanticipated circumstances. Those circumstances could include Mary Louise Mikols's mistaken assumption that funds from accounts would be available to fund the Trust in the manner she intended. Further, should the continuation of the trust on its existing terms

---

[13] The court allowed the modification even though the original intent of the settlor was for the property to be used as a school and held in trust in perpetuity. *City of Augusta*, 2008 ME 51, ¶ 15, 943 A.2d 582.
[14] "Comment a of the Restatement of Law (Third) Trusts § 66 (2003) also indicates emergencies are no longer necessary, and that modification or even termination because of unforeseen circumstances are permitted in order to give effect to what the settlor probably would have intended had he anticipated the change. This includes modification to provisions expressly forbidding the sale of a trust's corpus." *Id.* n. 16 (citing Restatement of Law (Third) Trusts § 66 cmt. b (2003)).

"become impracticable or wasteful or impair the trust's administration" the court may modify the administrative provisions of the Mary Louise Mikols Living Trust and allow sale of the property. 18-B M.R.S.A § 412.

### B. The Parties' Cross-Motions Regarding No-Contest Provisions

Mary Louise included a no-contest provision in both her pour-over will and the Trust instrument. Based on the plain language of the provisions, Mary Louise sought to prevent beneficiaries from challenging provisions of the Trust by disinheriting anyone seeking to challenge the construction of the instruments. Generally, such provisions "serve to protect estates from costly and time-consuming litigation [by] minimize[ing] family bickering over the competence and capacity of testators, and the various amounts bequeathed. However, the function of the court is to effect the testator's intent to the greatest extent possible within the bounds of the law." *In re Seymour*, 1979-NMSC-069, ¶ 19, 93 N.M. 328, 332, 600 P.2d 274.

The no-contest clause in the Mary Louise Mikols Living Trust is unambiguous. It states:

> **Section 13.03 Contest Provision**
> The right of a beneficiary to take any interest given to him or her under this trust or any trust created under this trust instrument will be determined as if the beneficiary predeceased me without leaving any surviving descendants if that beneficiary, alone or in conjunction with any other person, engages in any of these actions:
>> Contests by a claim of undue influence, fraud, menace, duress, or lack of testamentary capacity, or otherwise objects in any court to the validity of this trust, any trust created under the terms of this instrument, my Will, or any beneficiary designation of any annuity, retirement plan, IRA, Keogh, pension, profit-sharing plan, or insurance policy signed by me, (collectively referred to in this Section as *Document* or *Documents)* or any amendments or codicils to any Document;
>> seeks to obtain adjudication in any court proceeding that a Document or any of its provisions is void in any court proceeding, or otherwise seeks to void, nullify, or set aside a Document or any of its provisions;
>> files suit on a creditor's claim filed in a probate of my estate, against the trust estate, or any other Document, after rejection or lack of action by the respective fiduciary;

14

> files a petition or other pleading to change the character (community, separate, joint tenancy, partnership, domestic partnership, real or personal, tangible or intangible) of property already characterized by a Document;
>
> files petition to impose a constructive trust or resulting trust on any assets of the trust estate; or
>
> participates in any of the above actions in a manner adverse to the trust estate, such as conspiring with or assisting any person who takes any of these actions.

Mary Louise Mikols Living Trust § 13.03. Specifically, Mary Louise sought to prevent the following contests: "undue influence, fraud, menace, duress, [] lack of testamentary capacity, or other[] [objections] in any court to the validity of [the] trust." *Id.*

The Maine Probate Code states, "[a] provision in a will purporting to penalize any interested person for contesting the will or instituting other proceedings relating to the estate is unenforceable if probable cause exists for instituting proceedings." 18-A M.R.S. § 3-905. Thus, any claim by the Harris Defendants falling into the above-mentioned causes of action must be supported by adequate probable cause. *See In re Estate of Shumway*, 9 P.3d 1062, 1066 (Ariz. 2000) (explaining Section 3-905 expressly invalidates a no-contest clause if a challenger has probable cause to assert the claim).

"Whether there has been a 'contest' within the meaning of a particular no-contest clause depends upon the circumstances of the particular case and the language used much depends on the phrasing and reach of the *in terrorem* clause even though such clauses must be strictly construed." *Redman-Tafoya v. Armijo*, 2006-NMCA-011, ¶ 55, 138 N.M. 836, 848, 126 P.3d 1200 (quoting *In re Watson*, 223 Cal. Rptr. 14, 16 (Cal. Ct. App. 1986)). Further, "[a] case-by-case evaluation is necessary to decide whether an heir's conduct, including legal actions, constitute a contest of a will." *Armijo*, 138 N.M. 836, 845, 126 P.3d at 1209.

While Maine courts have had little opportunity to question the implications and validity of no-contest provisions in estate documents, in *In re Estate of Lewis*, the Law Court unambiguously held that a no-contest or *in terrorem* clause may not be "invoked or otherwise

15

used to chill a legitimate legal action." 2001 ME 74, ¶ 10, 770 A.2d 619. Other states, which adhere to the Uniform Probate and Trust Codes, have consistently held "no-contest provisions are valid and enforceable . . . but they are not effective to disinherit a beneficiary who has contested a will in good faith and with probable cause to believe that the will was invalid." *Armijo*, 138 N.M. 836, 846, 126 P.3d at 1210. Generally, "courts will not apply a no-contest provision in cases where the beneficiaries have not challenged the will and do not seek to nullify the estate document." *Id.* at 1214.

Ms. Martin contends that no probable cause or good faith can be discerned from the Harris Defendants' pleadings and that the Harris Defendants simply prefer the terms of Mary Louise's previous estate plan. Ms. Martin avers that the counterclaims asserted by the Harris Defendants should be interpreted as a challenge to the validity of the Trust in its entirety.

Although some of the Harris Defendants' defenses sweep that broadly, the thrust of the counterclaims presented by the Harris Defendants is not to challenge the validity of the Trust, but rather, to challenge Ms. Martin's interpretation of the Trust and her actions in the implementation of the Trust as designated successor trustee.

Count I of the Harris Defendants' counterclaim challenges Ms. Martin's action as holder of Power of Attorney and her failure to ensure that the Trust was adequately funded. Under this claim, the Harris Defendants seek relief pursuant to 18-B M.R.S. § 412, which allows the court to modify or terminate the Trust. Count II makes a claim against Ms. Martin for her personal negligence in the funding and operation of the Trust. Count III alleges breach of trust on behalf of Ms. Martin as trustee and alleges a breach of the duty to administer the trust impartially; breach of the duty to administer the Trust in good faith; breach of the duty to inform beneficiaries of material information; and breach of the terms of the Trust. Count IV requests that the court exercise its powers to terminate an uneconomic trust pursuant to 18-B

16

M.R.S. § 414. Finally, Count V requests specific declaratory relief preventing Ms. Martin from selling the Imperial Beach property and imposing a constructive trust over assets Ms. Martin holds personally. None of these claims seek to invalidate or nullify a provision of the Trust.

Counts I and IV of the Harris Defendants' counterclaims are authorized under Maine law by statute. The pursuit of claims authorized by statute "are [] to be characterized not as attacks on the validity of the Will or of a provision of the Will, but as legal actions under a valid Will with valid provisions to enforce rights granted expressly by statute." *Armijo*, 138 N.M. 836, 850, 126 P.3d at 1210. Counts II, III, and V challenge only Ms. Martin's personal actions as trustee and are therefore outside of the scope of Mary Louise's no-contest provision.

Ms. Martin further argues that the Harris Defendants made a tactical decision to litigate the issue of this case in a separate federal court proceeding while also removing the original probate action to Superior Court. Ms. Martin contends that this was an intentional act to ensure that Ms. Martin would be forced to litigate in two forums at once. She further argues that this action on behalf of the Defendants demonstrates their lack of good faith and probable cause.

However, "conduct and actions comprising resistance and lack of cooperation, even with hostility and opinion mixed in, cannot be characterized as attacking the validity of the Will or as seeking to nullify a material provision in the Will." *Id.* Thus, the court does not find this argument persuasive. It is generally accepted that testators and settlors "are still free to disinherit beneficiaries on any ground that does not violate public policy and that clearly and specifically expresses what type of legal proceedings, or what type of other conduct and actions, [testators or settlors] intend to discourage through the threat of disinheritance." *Id.* at 1215.

Lastly, Barbara Martin points to certain affirmative defenses asserted by the Harris Defendants, challenging the validity of the Trust and will. On their face, these defenses do

17

meet the definitions of the no-contest provisions. However, the circumstances surrounding the Trust in particular supply probable cause for such a challenge—it was Ms. Martin who recommended that Mary Louise Mikols consult with attorney Smyth, and it was Ms. Martin who actually signed the Trust. Although there is no indication of undue influence beyond whatever may be made of those circumstances, those circumstances, coupled with Ms. Martin's position regarding the administrative trust trumping the Imperial Beach proviso, confers enough legitimacy to the Harris Defendants' position to avoid a forfeiture through the no-contest provisions of the will and Trust.

The court denies the cross-motion of Ms. Martin based on the present record. Because this proceeding is still in progress, it would be inappropriate to grant judgment to the Harris Defendants on their cross-motion on this issue.

## IV. Conclusion

Based on the foregoing, the Harris Defendants are entitled to summary judgment as to Count V of their Counterclaim insofar as it seeks a declaratory judgment preventing Ms. Martin from selling the Imperial Beach, California property, without the consent of other trustees and without authorization from the court. This ruling is without prejudice to revisitation in the context of an application to the court for authority to sell.

As stated in the Mary Louise Mikols Living Trust, the Trust shall continue in an administrative phase for a "reasonable period of time necessary" to complete the administrative tasks set forth in this Article Five of the Trust. The present record does not enable the court to decide what is a "reasonable time necessary" to complete the administrative tasks. The Harris Defendants' motion on Count III of their counterclaim is therefore denied.

Finally, for the reasons given above, the court denies both of the parties' cross-motions on the issue of the no-contest provision in the Mary Louise Mikols Living Trust.

18

The entry will be:

(1) Defendants' Motion for Partial Summary Judgment is DENIED as to COUNT III and is GRANTED IN PART as to COUNT V, in that it is DECLARED that Barbara Martin as successor trustee of the Mary Louise Mikols Living Trust does not have authority to sell the Imperial Beach Property absent consent of other trustees, or unanticipated circumstances, or a court order authorizing sale.

(2) Plaintiff's and Defendants' Cross-Motions for Summary Judgment concerning the no-contest provisions are both DENIED.

Pursuant to M.R. Civ. P. 79(a), the Clerk is herby directed to incorporate the Order by reference in the docket.

Dated: November 13, 2014

A.M. Horton
Justice, Business & Consumer Court

Entered on the Docket: 11/13/14
Copies sent via Mail ___ Electronically ✓

19

Barbara T. Martin, Trustee of the Mary Louise Mikols Living Trust U/T/D October 12, 2012 v. Cynthia C Harris, Elizabeth H. Mikols, Julia A. Harris, and April F. Parras, et al.
BCD-CV-14-07


Barbara T. Martin, Trustee of the Mary Louise Mikols Living Trust U/T/D October 12, 2012
        Plaintiff / Counterclaim Defendant

        Counsel:                        William Devoe, Esq.
                                        80 Exchange Street
                                        P.O. Box 1210
                                        Bangor, ME 0442-1210


Cynthia C Harris, Elizabeth H. Mikols, Julia A. Harris, and April F. Parras, et al.
        Defendant / Counterclaim Plaintiffs

        Counsel:                        Christian Chandler, Esq.
                                        One Canal Plaza Suite 1000
                                        PO Box 7320
                                        Portland, ME 041112-7320